**AFFIRM; Opinion Filed October 25, 2013.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-13-00365-CV

**TENA PATTERSON, M.D. AND THE FAMILY MEDICAL CENTER AT NORTH GARLAND CLINIC, Appellants**

**V.**

**GENEVA ORTIZ, INDIVIDUALLY AND FOR THE BENEFIT OF MARIO ORTIZ, MARISELA ORTIZ AND MARITZA ORTIZ, Appellee**

**On Appeal from the 193rd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-09-14738**

## OPINION

Before Justices FitzGerald, Francis, and Myers
Opinion by Justice Myers

Tena Patterson, M.D. and the Family Medical Center at North Garland Clinic bring this interlocutory appeal of the trial court's denial of their motion to dismiss the claims for medical malpractice brought by Geneva Ortiz, individually and for the benefit of Mario Ortiz, Marisela Ortiz, and Maritza Ortiz. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(9) (West. Supp. 2012). Appellants contend the trial court abused its discretion by denying their motion to dismiss the claims because the expert report served by Ortiz was deficient under section 74.351 of the Texas Civil Practice & Remedies Code. On appeal, appellants assert the expert report failed to establish causation. We affirm the trial court's order denying the motion to dismiss.

## BACKGROUND

On March, 4, 2008, Raul Ortiz went to the Family Medical Center with an upper respiratory complaint. Raul was seen by various employees of the Family Medical Center, including Dr. Patterson. Dr. Patterson did not admit Raul to the hospital. The next day, Raul was admitted to Baylor Medical Center where he died. An autopsy the following day revealed Raul had bilateral pneumonitis and pulmonary edema.

Geneva Ortiz, Raul's wife, brought a wrongful death and survivorship action against appellants. Ortiz alleged appellants were negligent for failing: (1) to diagnose Raul's condition as pneumonia; (2) to perform tests that would disclose Raul's conditions; and (3) to refer Raul to an emergency health care facility for immediate treatment. She alleged these failures were a proximate cause of Raul's death.

Ortiz timely served appellants with a letter from Leigh S. Galatzan, M.D., purporting to meet the requirements for an expert report under section 74.351(r)(6) of the Texas Civil Practice & Remedies Code. Appellants filed objections to the report and filed a motion to dismiss. Appellants argued the report was deficient because it failed to show Dr. Galatzan was qualified to render an expert opinion, it failed to show how Dr. Patterson caused the alleged harm, it was speculative and conclusory concerning causation, and it failed to set forth any negligence by the Family Medical Center. *Ortiz v. Patterson*, 378 S.W.3d 667, 670–71 (Tex. App.—Dallas 2012, no pet.). The trial court granted the motion dismiss. *See id.* at 672.

On appeal, we concluded the trial court abused its discretion by determining Dr. Galatzan was not qualified to render an opinion. *See id.* at 673–74. However, we agreed with the trial court that the report was defective as to causation. *See id.* at 674–75. We also concluded the report failed to present any claims of direct negligence by the Family Medical Center but that a report was not necessary for the vicarious liability of the Family Medical Center. *See id.* at 675–

–2–

76. We also determined the trial court erred by denying Ortiz an extension of time to supplement the report. *See id.* at 677. We remanded the cause to the trial court for further proceedings. *Id.* at 678.

Back in the trial court, appellee served appellants with a supplemental expert report from Dr. Galatzan. Appellants objected to the new report as failing to meet the requirement of presenting opinions regarding the causal relationship between Dr. Patterson's omissions and the harm or injury to Raul. Appellants asked the court to dismiss the cause due to the inadequacy of the expert report. The trial court denied the motion to dismiss.

## APPLICABLE LAW

Chapter 74 of the civil practice and remedies code requires a claimant pursuing a health care liability claim to serve on each party one or more expert reports for each physician or health care provider against whom a health care liability claim is asserted. CIV. PRAC. § 74.351(a) (West 2011). An "expert report" is defined as follows:

> a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

*Id.* § 74.351(r)(6). An expert report must provide enough information to fulfill two purposes: it must inform the defendant of the specific conduct the plaintiff has called into question, and it must provide a basis for the trial judge to conclude that the claims have merit. *Ortiz*, 378 S.W.3d at 671; *Bakhtari v. Estate of Dumas*, 317 S.W.3d 486, 496 (Tex. App.—Dallas 2010, no pet.). A report is deficient if it merely states the expert's conclusions about the standard of care, breach, and causation. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 879 (Tex. 2001). The report must explain the basis for the expert's statements to link the conclusions to the facts. *Bowie Mem. Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002). We may not "fill gaps" in a

report drawing inferences or guessing what the expert meant or intended. *Hollingsworth v. Springs*, 353 S.W.3d 506, 513 (Tex. App.—Dallas 2011, no pet.) (citing *Wright*, 79 S.W.3d at 53). However, the report need not contain all the plaintiff's proof, and the report does not need to meet the same requirements as evidence submitted in a summary judgment proceeding or trial. *Bakhtari*, 317 S.W.3d at 496. We determine whether a causation opinion is sufficient by considering it in the context of the entire report. *Id.*

## STANDARD OF REVIEW

We review a trial court's ruling on a motion to dismiss for an abuse of discretion. *Palacios*, 46 S.W.3d at 875. A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner or without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). In other words, the trial court abuses its discretion when its actions are arbitrary or unreasonable. *Id.* "The mere fact that a trial judge may decide a matter within his discretionary authority in a different manner than an appellate judge in a similar circumstance does not demonstrate that an abuse of discretion has occurred." *Id.* However, a trial court has no discretion in determining what the law is or in applying the law to the facts. *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992) (orig. proceeding); *Children's Med. Ctr. of Dall. v. Durham*, 402 S.W.3d 391, 395 (Tex. App.—Dallas 2013, no pet.).

## ANALYSIS

In their sole issue on appeal, appellants contend the trial court abused its discretion by denying their motion to dismiss because Dr. Galatzan's supplemental report does not establish causation. Causation is established in medical malpractice cases through evidence of a "reasonable medical probability" or "reasonable probability" that the injuries were caused by the defendant's negligence; in other words, the plaintiff must present evidence "that it is 'more likely

–4–

than not' that the ultimate harm or condition resulted from such negligence." *Jelinek v. Casas*, 328 S.W.3d 526, 532–33 (Tex. 2010) (quoting *Kramer v. Lewisville Mem. Hosp.*, 858 S.W.2d 397, 399–400 (Tex. 1993)).

In the original expert report, Dr. Galatzan described Raul's symptoms and Dr. Patterson's notes contradicting those symptoms. Dr. Galatzan then stated,

> A patient presenting as Mr. Ortiz did on March 3, 20008, should have had a pulse oximetry assessment, and a chest x-ray. *Failing to do the appropriate tests, make the correct diagnosis, and recognize the clinical severity and risks involved in not referring Mr. Ortiz for admission to a hospital did not meet the standard of care, and contributed to the premature death of the this man. If Mr. Ortiz had received appropriate evaluation and treatment it is more likely than not that he would have survived this ordeal.*

*Ortiz*, 378 S.W.3d at 673. This Court concluded that the trial court did not abuse its discretion by determining that the report failed to meet the requirements of an expert report concerning causation. We stated that the two italicized sentences "merely state a conclusion about causation; they are equivalent to the conclusory opinion that 'the violations of the standard of care were a proximate cause of this patient's injury.'" *Id.* at 674. Distinguishing the report before us from those in two other cases,[1] we stated that Dr. Galatzan's report "failed to explain how Raul's condition worsened from 'very ill' to death from pneumonia and pulmonary edema in a short time as a result of failing to conduct certain tests and admit him to a hospital without relying on impermissible inferences." *Id.* at 675. We concluded the trial court did not abuse its discretion by determining the expert report was deficient as to causation. *Id.*

Dr. Galatzan's supplemental report[2] added more details of the diagnostic tests Dr. Patterson should have run. The report stated a patient reporting the symptoms and medical

---

[1] *See Adeyemi v. Guerrero*, 329 S.W.3d 241, 245 (Tex. App.—Dallas 2010, no pet.); *Mosely v. Mundine*, 249 S.W.3d 775, 780 (Tex. App.—Dallas 2008, no pet.).

[2] Hereafter, references to Dr. Galatzan's "report" are to the supplemental report dated January 4, 2013. The portions of the report setting forth the standard of care, breach of the standard, and causation were as follows:

–5–

I have reviewed the medical records from Dr. Tena Patterson and the Family Medical Center at Garland concerning the diagnosis and treatment of Mr. Raul Ortiz on the date of service March 4, 2008, as well as the medical records from Baylor Medical Center at Garland for the date of service March 5, 2008. In addition, I reviewed the autopsy report of Mr. Raul Ortiz, dated March 6, 2008.

The standard of care for a patient presenting with Mr. Ortiz's symptoms, vital signs, and, his history of diabetes would dictate that he receive the following care and treatment:

1. A thorough evaluation of the patient's complaints and vital signs, including an assessment of pulse oximetry.

2. A thorough physical examination.

3. A chest X-ray.

4. Complete lab work, including a metabolic profile and blood cultures.

5. Hospital admission.

In my opinion, the standard of care for a practicing physician was not met on March 4, 2008, when Mr. Ortiz presented for evaluation and treatment. Considering that Mr. Ortiz described symptoms of cough, congestion, and fever for one week, that he had been vomiting and presented with a heart rate of 145 beats per minute, and that he was a diabetic, the examining physician should have recognized that the patient was very ill. This clinical presentation contradicts the statement in the record that the patient was "in no acute distress." In fact, the normal exam that was documented is not at all consistent with the patient's complaints, his vital signs, and especially with the autopsy findings of bilateral pneumonitis and pulmonary edema.

Given his symptoms, vital signs, and the history of diabetes, Mr. Ortiz should have promptly received the following care and treatment:

1. A thorough evaluation of the patient's complaints and vital signs, including an assessment of pulse oximetry. This evaluation likely would have revealed that patient was septic and unstable. Based on his post-mortem findings, the pulse oximetry would have shown that the patient was hypoxic.

2. A thorough physical examination would have likely revealed decreased and abnormal breath sounds, suggesting pneumonia, and requiring additional evaluation and consideration for admission.

3. A chest X-ray would likely have documented that Mr. Ortiz had pneumonia.

4. Complete lab work, including a metabolic profile and blood cultures. These tests would have alerted the physician of any abnormalities in his metabolic status, such as electrolyte abnormalities, acidosis, dehydration, and hyperglycemia.

5. Mr. Ortiz should have been promptly admitted to the hospital because, by all indicators, he was very ill. Based on his symptoms, his vital signs, his history of diabetes, his subsequent rapid demise, and the findings at autopsy, early, aggressive treatment, more likely than not, would have saved his life.

If the treating physician had properly assessed Mr. Ortiz, she would have noted that his tachycardia was out of proportion to his low grade fever, suggesting that the patient was septic and/or dehydrated. In addition, a patient with a history of diabetes and cough, fever, vomiting, and tachycardia should prompt a prudent physician to more thoroughly evaluate that patient with laboratory tests, a chest X-ray, IV fluid resuscitation, and admission to a hospital. Mr. Ortiz's autopsy findings, just forty eight hours after his office visit, showed that he had extensive pneumonitis and pulmonary edema. The abnormal vital signs, the patient's vomiting, the notes stating that he was "in no acute distress," that his "respiratory rate was unlabored," and that his lungs were "clear to auscultation," are inconsistent with a thorough and accurate physical examination and assessment of the patient. The results were an inaccurate diagnosis, and the patient's death.

In my opinion, the proximate cause of death in this case was due to the treating physician's failure to follow the standard of care in that:

1. There was no thorough evaluation of the patient's complaints and vital signs, including an assessment of pulse oximetry.

2. There was no thorough physical examination.

3. There was a failure to perform a chest X-ray.

history of Raul should have been evaluated with a thorough evaluation of his complaints and vital signs, including his pulse oximetry, which would have shown he was a hypoxic; a thorough physical evaluation, which would have shown decreased and abnormal breath sounds suggesting pneumonia; a chest x-ray, which would have shown whether he had pneumonia, and the autopsy results showed that in fact Raul had pneumonia; complete lab work, which would have alerted Dr. Patterson to any abnormalities in his metabolic status. Dr. Patterson should then have admitted Raul to the hospital where "early, aggressive treatment, more likely than not, would have saved his life." The report stated that Dr. Patterson's failure to proceed in this manner resulted in "an inaccurate diagnosis, and the patient's death." The report stated that "[t]he opinion with respect to proximate cause is based on a reasonable degree of medical probability."

Appellants assert that Dr. Galatzan's report fails to meet the requirement we set forth in *Hollingsworth* that an expert's opinions adequately link the conduct identified as necessary with the claimant's injuries. *See Hollingsworth v. Springs*, 353 S.W.3d 506, 520–21 (Tex. App.—Dallas 2011, no pet.) ("The question is whether Groudine's opinions have adequately linked the conduct he has identified as necessary—properly checking the workings of the anesthesia circuit—with Spring's injuries."). Appellants argue that Galatzan's report "is deficient on causation because absent from the report is any discussion or explanation about how and why the failure to conduct certain tests, certain examinations and admit Decedent to a hospital caused his death." We disagree. The report stated that Dr. Patterson's failure to perform the tests,

---

4.  There was a failure to perform complete lab work, including a metabolic profile and blood cultures.

5.  There was a failure to refer Mr. Ortiz for a hospital admission.

The failure to do a thorough evaluation of the patient, order the appropriate tests as indicated above, the failure to make the correct diagnosis of pneumonia, pulmonary edema, and respiratory failure, and, the failure to recognize the clinical severity, risks, and potential complications involved in not referring Mr. Ortiz for hospital admission were all a proximate cause of his death. If Mr. Ortiz had been properly evaluated and treated in accordance with the standard of care as outlined above, it is more likely than not, that Mr. Ortiz would have survived this illness. This opinion with respect to proximate cause is based on a reasonable degree of medical probability.

examinations, and assessments resulted in "an inaccurate diagnosis, and the patient's death," which the report (relying on the autopsy report) showed was from pneumonia. The report stated that if Dr. Patterson had performed the tests, diagnosed Raul as suffering from pneumonia, and determined Raul required hospitalization, Raul could have then received "early, aggressive treatment [that], more likely than not, would have saved his life." These statements explain why Dr. Patterson's conduct caused Raul's death.

In *Hollingsworth*, the patient went to a hospital for minor surgery, removal of a cyst on his arm. *Hollingsworth*, 353 S.W.3d at 511. When the anesthesiologist was trying to anesthetize the patient, the patient had difficulty breathing. *Id.* at 512. While the anesthesiologist attempted to remedy the patient's breathing problem, the patient suffered a cardiopulmonary arrest and was resuscitated. However, the patient suffered a hypoxic brain injury, was nonresponsive to verbal commands, and later died. *Id.* at 511, 518. The patient's family sued the anesthesia technicians, amongst others. The anesthesia equipment had alarms that should have, but failed, to go off during the efforts to secure an airway for the patient. *Id.* at 520. The expert report on the anesthesia technicians stated they had a duty to check the equipment to make sure the alarms were not turned off or disabled. *Id.* The report stated that the failure to check the anesthesia equipment was beneath the standard of care and "compromised the attempted failed induction and the resuscitation effort." *Id.* We stated that the report did not explain how the failure of the alarms was linked to the patient's brain injury. *Id.* at 521. We could not infer how working alarms would have led to a better outcome for the patient. *Id.* Because the report did not explain these causal links, we concluded the report was conclusory on causation. *Id.*

In the case before us, however, Dr. Galatzan's report showed that performing the tests and examinations would have led to the diagnosis of pneumonia and Raul's admission to the hospital, where he would have received "early, aggressive treatment [that], more likely than not,

would have saved his life."   The report in *Hollingsworth* contained no such statement demonstrating how working alarms would have prevented the patient's brain injury.   We conclude *Hollingsworth* is distinguishable.

Appellants also assert Dr. Galatzan's report is deficient because "it fails to discuss what treatment should have been provided to Decedent and fails to discuss and explain how and why some specific *treatment* would have prevented Decedent's death."   The "treatment" the report states Dr. Patterson should have provided was to admit Raul to a hospital.   The report explains how the action of admitting Raul to the hospital would have prevented his death by stating that at the hospital, Raul would have received "early, aggressive treatment [that], more likely than not, would have saved his life."

In support of their argument, appellants assert that six cases show that Dr. Galatzan's report was insufficient for failing to discuss what treatment Dr. Patterson should have provided. These cases illustrate that mere observation, monitoring, testing, and evaluating, by themselves, generally do not constitute the cause of a patient's injury.   Those activities do not alter the outcome because they simply constitute watching and data gathering.   They may provide the information the doctors and health care providers need to take some action to alter the outcome. If the action based on the observation, monitoring, testing, and evaluating would have avoided the patient's injury, then there is a causal relationship between the failure to observe, monitor, test, and evaluate and the patient's injury.   However, if that action would not have avoided the patient's injury, then there is no causal relationship between the failure to observe, monitor, test, and evaluate and the injury.   Therefore, if the report states the breach of the standard of care by the physician or health care provider is the failure to monitor, observe, test, or evaluate, the report must explain what action the defendant physician or health care provider would have taken in response to the data obtained from the monitoring, monitoring, testing, and evaluating

–9–

that should have been performed, including passing that data to another physician or health care provider who could take action that would have altered the patient's outcome. The report must explain why the action the defendant should have taken, either by itself or in coordination with the actions of others, would have prevented the patient's injury.

In *Ngo v. Lewis*, No. 09-10-00140-CV, 2010 WL 3518225 (Tex. App.—Beaumont Sept. 9, 2010, no pet.) (mem. op.), a woman who was positive for Vaginal Group B Streptococcus (GBS) was admitted to the hospital for delivery of her child. *Id.* at *1. The hospital was incorrectly informed by her obstetrician that she was negative for GBS; in fact, she was positive for GBS. During delivery, her child was exposed to the infection and became ill. The child came under the care of the first defendant, Dr. Ngo, at 7:50 p.m., one and a half hours after delivery. At 8:15 p.m., Dr. Ngo consulted with the second defendant, a neonatologist, Dr. Annavajjhala. At 9:00 p.m., the child was transferred to the neonatal intensive care unit. *Id.* At that time, the child was in distress, and the child received its first dose of spectrum antibiotics at 9:37 p.m. *Id.* at *2. At 3:20 a.m., Dr. Annavajjhala ordered the patient moved to a hospital in Houston. The child died six days later. *Id.* The expert report stated Dr. Ngo breached the standard of care by failing to obtain blood work and order antibiotics in a timely fashion, failed to order and evaluate blood gases in a timely fashion, and failed to consult a neonatologist in a timely fashion. *Id.* at *3. The report stated that these actions and inactions of Dr. Ngo "more likely than not proximately caused [the child's] irreversible neurological damage and subsequent death." *Id.* The court of appeals concluded the report was deficient because it "fails to explain how Dr. Ngo's alleged delays were substantial factors in bringing about Ian's death." *Id.* at *4. The report contained "analytical gaps with respect to the connecting the delays identified by the report to having caused [the child's] death." *Id.* at *3. Concerning Dr. Annavajjhala, the report stated she failed to act in a timely fashion to provide the child respiratory support, evaluate the

child's blood gases, and treat his hypertension. *Id.* at *4. On causation, the report stated the doctor's deviations from the standard of care "more likely than not proximately caused [the child's] irreversible neurological damage and subsequent death. *Id.* The court of appeals states the report did not explain how the acts and omissions identified in the report affected the child's chance of survival. The report "fail[ed] to explain what additional treatment should have been offered had the various procedures he describes been performed timely. . . . How delays in providing [the child] adequate ventilation support, delays in obtaining blood gases or delays in treating [the child's] hypertension caused [the child's] death is never explained the report." *Id.* The mere statement that the acts and omissions caused the child's death was an insufficient explanation of causation to comply with the requirements of section 74.351. *Id.*

In *Lewis v. Funderburk*, No. 10-05-00197-CV, 2008 WL 5473043 (Tex. App.—Waco Dec. 31, 2008, pet. denied) (mem. op.), the patient sought treatment for a fractured wrist. *Id.* at *1. The fracture did not heal properly and required surgery. *Id.* at * 7. The doctor was sued for malpractice. *Id.* at *1. The expert report stated the doctor deviated from the standard of care by not taking x-rays at regular intervals to confirm proper healing and that "loss of position has not occurred." *Id.* at *6. The report concluded that "[t]hese deviations and breaches from the standard care [sic] were the proximate causes of the malunited left distal radius fracture." *Id.* The court of appeals stated the expert "explained how [the doctor] failed to detect a misalignment, which inferentially preceded the malunion, but he did not explain what [the doctor] could or should have done about it upon making this discovery." The court concluded the report failed to provide a fair summary of the causal relationship between the doctor's failure to monitor the fracture as it healed and the malunited fracture. *Id.* at *8.

In *Craig v. Dearbonne*, 259 S.W.3d 308 (Tex. App.—Beaumont 2008, no pet.), the patient was admitted to the hospital with pneumonia on January 25, 2005. *Id.* at 310. The

defendant doctor saw the patient on January 25, 27, and 28. *Id.* The patient was transferred to another hospital on January 29 and died three days later. *Id.* at 311. The expert report stated the doctor should have ordered daily x-rays to assess the patient's pneumonia and that the doctor breached the standard of care by not seeing the patient on January 26 because the standard of care required daily examination and assessment. *Id.* at 312. The report stated that if the doctor had properly examined and assessed the patient daily, then the worsening pneumonia would have been recognized, and the patient "could have been effectively treated on 01/26/05, 01/27/05 and 01/28/05." *Id.* The report also stated, "If proper assessment and treatment had been performed by [the doctor] on 01/26, 01/27, or 01/28 then more likely than not, [the patient] could have been successfully treated and would not have died when she did." *Id.* The court of appeals concluded these statements in the report were conclusory because they "do not explain precisely how [the doctor's] negligence proximately caused [the patient's] death. . . . In addition, the report fails to explain what treatment would have been effective, but was not provided or whether the treatment Craig provided would have been effective if it had been started earlier." *Id.* at 313 (citation omitted).

In *Gray v. CHCA Bayshore, L.P.*, 189 S.W.3d 855 (Tex. App.—Houston [1st Dist.] 2006, no pet.), the patient underwent sinus surgery at the hospital for chronic sinusitis and nasal septal deformity. *Id.* at 856. When she awoke, she had pain in her left knee, later determined to be a dislocated patella. *Id.* She sued the anesthesiologist and the hospital for the injury to her knee, alleging the injury was caused by flexing of her leg during surgery and that the injury could have been prevented by the anesthesiologist and nursing staff monitoring her extremities during the surgery. *Id.* at 856–57. The trial court determined the expert report was deficient and dismissed the patient's suit. *Id.* at 858. In the report, the expert stated the doctor and nurses failed to monitor the positioning of the patient's left knee and monitor her extremities during surgery to

–12–

prevent injury during surgery and post operatively. *Id.* at 857. On causation, the report stated that if the anesthesiologist and nursing staff "had monitored and detected the flexing of [the patient's] arms and legs during general anesthesia in a timely fashion, then in reasonable medical probability," the injury would not have occurred. *Id.* The report also stated, "The failure to monitor and detect the malpositioned left knee resulted in a dislocated left patella, severe pain and suffering, and subsequent medical treatment." *Id.* at 858. The court of appeals stated the report did not set forth a breach of the standard of care because the report did not state what the defendants should have done differently other than monitoring the patient. *Id.* at 859. Likewise, the court of appeals stated the report did not satisfy the statutory elements of causation because it did not state with any specificity how the failure to monitor caused the patient's injury. *Id.* at 860. The court of appeals concluded the trial court did not abuse its discretion by dismissing the patient's claims. *Id.*

In *Costello v. Christus Santa Rosa Health Care Corp.*, 141 S.W.3d 245 (Tex. App.—San Antonio 2004, no pet.), the patient went to the hospital emergency room complaining of chest pain. *Id.* at 247. After being "triaged" by the nursing staff, the patient was instructed to wait in the waiting room. Forty minutes later, the patient suffered a cardiac arrest and could not be resuscitated. *Id.* The expert report stated patients in that situation "require immediate triage to an examination room, placement on a telemetry monitor, and a 'stat' EKG followed by prompt physician evaluation. . . . If this patient would have been appropriately triaged and evaluated, then in all reasonable medical probability she would have survived." *Id.* The trial court granted the hospital's motion to dismiss. *Id.* The court of appeals concluded the report was deficient as to causation because it did not explain the causal relationship between the hospital's omissions— failure to triage and evaluate—and the patient's death. *Id.* at 249. The court went on to state that the report did not explain what medical information triage and evaluation would have revealed.

The report also failed to state what would have been done if the omissions had not occurred, what treatment would have been available, or that some "unknown treatment could have or would have been effective." *Id.* The court of appeals affirmed the trial court's dismissal of the case.

In *Gonzales v. Graves*, No. 07-03-00268-CV, 2004 WL 510898 (Tex. App.—Amarillo 2004, no pet.) (mem. op.), the patient went to the emergency room complaining of back and abdominal pain, slight wheezing, and shortness of breath. *Id.* at *3. The emergency room physician prescribed medication and referred the patient to a urologist, Dr. Graves, because of tumors in the patient's scrotal sac. Dr. Graves performed an "intravenous pyelogram, which was essentially unremarkable." *Id.* Within fifty-two hours of first going to the emergency room, the patient tried to return there; however, he suffered cardiac arrest in the car and could not be resuscitated. The cause of death was "bronchopneumonia with left empyema." The patient's surviving spouse sued Dr. Graves for failing to diagnose and treat the patient properly. *Id.* The expert report stated Dr. Graves did not take the patient's history and conduct a thorough physical examination of him. *Id.* at *3, *4. The trial court dismissed the claim because the expert report was deficient. The court of appeals agreed, and stated that the report failed to state "what, if anything, should have been done to address [the patient's] complaints." *Id.* at *4. The court also concluded the discussion of causation was inadequate: "It is not enough to merely state, as [the expert] did here, that the failure to diagnose [the patient's] pneumonia was the proximate cause of his death." *Id.* at *5.

These cases are distinguishable from the case before us because the reports in those cases stated the failure to examine, monitor, test, and evaluate the patients' condition was the cause of the patients' injuries. Dr. Galatzan's report goes beyond merely stating the failure to examine, monitor, test, and evaluate caused Raul's death. The report specified the action Dr. Patterson

–14–

should have taken in response to the results of the examination and testing:  prompt hospitalization of Raul where he could receive early, aggressive treatment for his pneumonia. The report states that hospitalization with the early, aggressive treatment would have saved Raul's life.  To the extent appellants may be arguing that the report was deficient for not specifying the precise treatment Raul would have received in the hospital,[3] appellants cite no authority requiring the report to specify the actions that should or would have been taken by anyone other than the defendant physicians and health care providers.

In this case, the trial court acted within its broad discretion when it concluded the report adequately identified the omissions of Dr. Patterson that breached the standard of conduct, specified the actions Dr. Patterson should have taken, and explained "the causal relationship between that failure and the injury, harm, or damages claimed."  *See* CIV. PRAC. § 74.351(r)(6). Unlike the original report, the explanation of causation in Dr. Galatzan's supplemental report is not the equivalent of stating, "the violations of the standard of care were a proximate cause of this patient's injury."  *See Ortiz*, 378 S.W.3d at 674.  Although the report's explanation of causation could have been more detailed, we cannot conclude the trial court's denial of appellants' motion to dismiss was arbitrary or unreasonable or without reference to any guiding rules or principals.  We conclude the trial court did not err by denying appellants' motion to dismiss.

We overrule appellants' sole issue on appeal.

---

[3] Appellants do not make this argument expressly.  Except for the "Statement of Facts" section of their brief, appellants do not mention the portion of Dr. Galatzan's report stating that Raul's admission to a hospital where he would receive "early, aggressive treatment" would have saved his life.

**CONCLUSION**

We affirm the trial court's order denying appellant's motion to dismiss.


/Lana Myers/
LANA MYERS
JUSTICE



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

Dr. Tena Patterson and the Family Medical
Center, Appellants

No. 05-13-00365-CV      V.

Geneva Ortiz, Individually and for the
Benefit of Mario Ortiz, Marisela Ortiz, and
Maritza Ortiz, Appellee

On Appeal from the 193rd Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DC-09-14738.
Opinion delivered by Justice Myers.
Justices FitzGerald and Francis participating.

      In accordance with this Court's opinion of this date, the order of the trial court is
**AFFIRMED**.

      It is **ORDERED** that appellee Geneva Ortiz, individually and for the benefit of Mario
Ortiz, Marisela Ortiz, and Maritza Ortiz, recover her costs of this appeal from appellants Dr.
Tena Patterson and the Family Medical Center.

Judgment entered this 25th day of October, 2013.

/Lana Myers/
LANA MYERS
JUSTICE