**Opinion filed September 23, 2021**



In The

# Eleventh Court of Appeals

_____

## No. 11-19-00338-CV

_____

## MCH PROFESSIONAL CARE AND KRISTOPHER KINDLE, CRNA, Appellants

## V.

## YULISSA ZUBIA, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF ELPIDIA RIOS DE ZUBIA; RENE ZUBIA; AND RENE ZUBIA, JR., Appellees

### On Appeal from the 161st District Court
### Ector County, Texas
### Trial Court Cause No. B-16-12-1170-CV

## M E M O R A N D U M   O P I N I O N

Appellants, MCH Professional Care and Kristopher Kindle, CRNA, bring this interlocutory appeal from the trial court's denial of a motion to dismiss the health care liability claims brought by Yulissa Zubia, individually and as representative of the Estate of Elpidia Rios de Zubia; Rene Zubia; and Rene Zubia, Jr., jointly referred to herein as "Appellees." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(*l*) (West

2017).  We reverse and render judgment dismissing with prejudice Appellees' claims against Appellants.

## Background Facts

This case is a continuation of the same litigation that this court previously addressed in *MCH Professional Care v. Zubia*, No. 11-17-00115-CV, 2019 WL 2385771 (Tex. App.—Eastland June 6, 2019, no pet.) (mem. op.) (hereinafter referred to as *Zubia I*).  Thus, we forego a detailed explanation of the background facts in this case and instead defer to the facts as set forth in our previous opinion, supplementing this opinion with the relevant facts as needed.  *See* 2019 WL 2385771, at *1.

In *Zubia I*, which involved the same parties and legal issues as those currently at issue here, we concluded that the trial court abused its discretion in overruling Appellants' objection to the expert report of Appellees' expert because the report "fail[ed] to state the specific conduct that breached the applicable standard of care and [was] conclusory regarding causation."  *Id.*  Further, the basis of its statements regarding causation were not supported by identified facts.  *Id.* at *4–5.  We reversed and remanded the original matter so that the trial court could have an opportunity to consider an extension so that Appellees could cure the defect in the report.  *See* CIV. PRAC. & REM. § 74.351(c).  On remand, Appellees provided to the trial court an amended expert report, to which Appellants again objected as insufficient on similar grounds.  The trial court overruled Appellants' objections and denied their motion to dismiss.  This appeal followed.

## Standard of Review and Relevant Law

The Texas Medical Liability Act (TMLA) requires health care liability claimants to serve an expert report upon each defendant within 120 days after the defendant files an answer.  *Id.* § 74.351(a); *Baylor Scott & White, Hillcrest Med. Ctr. v. Weems*, 575 S.W.3d 357, 363 (Tex. 2019).  The purpose of the expert report

requirement is "to weed out frivolous malpractice claims in the early stages of litigation, not to dispose of potentially meritorious claims." *Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 223 (Tex. 2018) (per curiam).

An expert report must provide a fair summary of the expert's opinions regarding the applicable standard of care, the manner in which the care rendered failed to meet that standard, and the causal relationship between the failure to meet the standard of care and the injury suffered. CIV. PRAC. REM. § 74.351(r)(6); *Abshire*, 563 S.W.3d at 223; *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001) (citing former version of TMLA). However, the expert report must still set out what care was expected but not given. *Abshire*, 563 S.W.3d at 226 (citing *Palacios*, 46 S.W.3d at 880). Sections 74.351(*l*) and 74.351(r)(6) require that the expert report explain how and why the alleged negligence caused the injury in question. *Id.* at 224 (citing *Jelinek v. Casas*, 328 S.W.3d 526, 536 (Tex. 2010)). The expert must explain the basis of his statements and link his conclusions to specific facts. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (per curiam) (citing former version of TMLA); *see also Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 461 (Tex. 2017) ("[W]ithout factual explanations, the reports are nothing more than the *ipse dixit* of the experts, which . . . are clearly insufficient."). The expert report must set forth specific information about what the defendant should have done differently, and it must explain factually how proximate cause is going to be proven. *Abshire*, 563 S.W.3d at 226.

A trial court may grant a motion to dismiss under the TMLA only if it appears that the expert report is not an objective good faith effort to comply with the statutory requirements. CIV. PRAC. & REM. § 74.351(*l*). An expert report demonstrates a "good faith effort" when it (1) informs the defendant of the specific conduct the plaintiff has called into question and (2) provides a basis for the trial court to

conclude that the claims have merit. *Baty v. Futrell*, 543 S.W.3d 689, 693–94 (Tex. 2018). "A report that merely states the expert's conclusions about the standard of care, breach, and causation" is insufficient. *Palacios*, 46 S.W.3d at 879; *accord Abshire*, 563 S.W.3d at 223. An expert's mere conclusion that the standard of care was not met does not constitute a good faith effort to comply with the statutory requirements. *Palacios*, 46 S.W.3d at 880.

We review a trial court's decision to deny a motion to dismiss based on the sufficiency of an expert report for an abuse of discretion. *Abshire*, 563 S.W.3d at 223. A trial court abuses its discretion if it acts without reference to guiding rules or principles. *Id.* In determining whether the report is sufficient, courts may not draw any inferences; instead, courts must consider only the information contained within the four corners of the report. *See Abshire*, 563 S.W.3d at 223; *Palacios*, 46 S.W.3d at 879. A court must review the entire report, not just specific portions or sections. *Baty*, 543 S.W.3d at 694. We defer to the trial court's factual determinations if supported by the evidence, but we review its legal determinations de novo. *Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 142 (Tex. 2015) (per curiam).

*Analysis*

In their only issue on appeal, Appellants contend that the trial court abused its discretion when it overruled the objections to the sufficiency of Dr. Hurt's report and denied the motion to dismiss. *See* CIV. PRAC. & REM. § 74.351(*l*), (r)(6). Specifically, Appellants assert that Dr. Hurt's report still fails to meet the requirements of Section 74.351 of the TMLA and fails to provide the necessary factual basis to support his causation opinions. *See id.*

In what Dr. Hurt denominates as his "Curative Report," appearing in form and substance to have been an amended report, Dr. Hurt sets forth four different standards of care: (1) Kristopher Kindle, CRNA, should have completed a preoperative assessment plan for Elpidia Rios de Zubia (Zubia) prior to her

4

procedure; (2) Kindle should have clinically monitored Zubia's physiological condition and oxygenation levels; (3) Kindle should not have allowed an inexperienced third-year medical student to attempt endotracheal intubation on Zubia; and (4) Kindle should have checked the anesthesia machine/equipment/monitors for leaks prior to Zubia's procedure. Although the standards of care relied upon were clearly set out, Appellants attack Dr. Hurt's report and assert that Dr. Hurt failed to provide the necessary factual basis to support his causation opinions. We particularly examine the amended report to determine whether it is indeed "curative" of the deficiencies previously identified by this court in *Zubia I* and whether it includes substantive links between the stated breaches of the standards of care and causation of Zubia's death, supported by identified facts. We will address each of these standards separately, mindful of the rule requiring us to view the report in its entirety, not in isolated portions or sections. *See Baty*, 543 S.W.3d at 694.

### I. Preoperative Assessment Plan

Dr. Hurt first provides that "the appropriate standard of care for an anesthesia clinician is to accurately complete a preoperative assessment and anesthetic plan for the patient," which would have included the implementation of Monitored Anesthesia Care (MAC). He states that completing a preoperative assessment plan allows the clinician to "evaluate the patient's condition (physical, mental, and physiological) for possible risks of complications during the procedure." Dr. Hurt opines that morbid obesity is a typical comorbidity which increases the risk of certain complications occurring during anesthesia, such as heart rate irregularities and oxygenation levels dropping. According to Dr. Hurt, a properly completed plan would have identified Zubia as morbidly obese and at a higher risk for these complications, and "would have allowed him to offer Elpidia Rios de Zubia safer alternatives to general anesthesia without complications relative to her morbid

5

obesity." In what appears to be a statement on causation—a statement which is virtually cut and pasted at the end of almost every discussion for each standard of care—Dr. Hurt asserts:

> Based upon my experience, skill, knowledge and training as a board certified anesthesiologist, Kristopher Kindle, CRNA's, breached the standard of care in not completing a preoperative assessment and anesthesia plan for Elpidia Rios de Zubia, for which he would have been able to identify the potential for intraoperative complications such as decreasing oxygenation levels and rapid heart rate decline was a proximate cause of Elpidia Rios de Zubia's death.

Dr. Hurt further addresses causation later in his report:

> The autopsy and death certificate indicate Elpidia Rios de Zubia died as a result of intraoperative complications during anesthesia. The intraoperative complications Elpidia Rios de Zubia suffered from were rapid oxygen desaturation and heart rate plummeting as a result. It was these complications which caused her death. Thus, had Kristiopher [sic] Kindle, CRNA, followed the appropriate standard of care and properly completed a preoperative assessment and anesthesia plan or MAC, he would have been aware of the inherent risks of these complications and could have prevented same. Instead, his failure to become aware of the risks of complications that Elpidia Rios de Zubia was mentally, physically or physiologically exhibiting were ignored. As a result she died.

Although Dr. Hurt proffers a standard-of-care violation and states that the standard was not met, Dr. Hurt does not identify the facts in support of causation linking the alleged breach to the injury. Importantly, we first note that although Dr. Hurt contends that completing a preoperative assessment plan would have allowed Kindle to offer "safer alternatives," he does not list what the alleged safer alternatives were. Nor does he state whether failing to choose them was a proximate cause of Zubia's death and, if so, why failing to choose them was a proximate cause.

Furthermore, while a written plan might be preferred, the lack of a written plan is not evidence that the considerations to be documented on the written plan

were not actually made in this instance or that such considerations were absent from a standard protocol. With regard to the actual cause of Zubia's death, Dr. Hurt simply concludes that Zubia died because her oxygen levels decreased and her heart rate dropped. However, this merely provides a general explanation of what occurs at death. To oversimplify, at death, one stops breathing and their heart stops—or vice versa. It is axiomatic, then, that oxygen desaturation occurs and heart rate declines upon death. But such information, without more, does not adequately address causation or identify the supporting facts in this case. Otherwise, in every death case under Chapter 74, a plaintiff's expert, without a good faith effort, could make global observations and undermine the legislative purposes of weeding out frivolous claims in the early stages and not disposing of potential meritorious claims.

To avoid such an unintended result, the causation element "requires that the expert explain 'how and why' the alleged negligence caused the [death] in question." *Abshire*, 563 S.W.3d at 224 (citing *Jelinek*, 328 S.W.3d at 536). In order to satisfy this "how and why" requirement, the expert is not required to prove the entire case or account for every known fact; rather, the report will sufficiently establish causation if it makes "a good-faith effort to explain, factually, how proximate cause is going to be proven." *Id.* (quoting *Zamarripa*, 526 S.W.3d at 460). Additionally, an alleged breach of a standard of care must be proximately linked to the injury by identified facts. *See Bowie Mem'l Hosp.*, 79 S.W.3d at 52; *see also Zamarripa*, 526 S.W.3d at 460.

The deficiencies in Dr. Hurt's reports become more apparent when compared to a report which plainly satisfies the requirements of Section 74.351. In *Abshire*, for example, the Texas Supreme Court found an expert report's explanation of causality sufficient where the report stated:

> The harm/injury that resulted from the substandard care provided by [Christus] was the exacerbation of an undiagnosed vertebral fracture

that lead [sic] to a spinal cord injury resulting in paraplegia and bowel and bladder incontinence.

Failure of the nursing staff to document a complete and accurate assessment resulted in a delay in proper medical care (ie. [sic] the ordering of imaging studies and protection of the spine.). . . . [H]ad the symptomology that Ms. Abshire was experiencing been appropriately linked to the [OI] diagnosis then she could have been admitted to the hospital on absolute bed rest, imaging studies such as a CT or MRI of her back ordered, then treatment started to preserved [sic] the integrity of the spine. . . .

The hospital staff clearly ignored signs and symptoms of spinal injury and kept investigating the same areas over and over with no relief to the patient. . . . This failure on the part of the hospital staff allowed the spinal injury to progress to the point of paraplegia.

Failure to consider the patient's prior relevant medical history was mostly [sic] likely a cause of the hospital staff's focus on the potential cardiac element of Ms. Abshire's pain. . . . Had they had a complete medical history they would have known to examine other areas and that this patient had a high probability of a compression fracture. The lack of proper documentation in the patient's medical record lead [sic] to a delay in treatment of Ms. Abshire's compression fracture which in medical probability lead [sic] to paralysis.

*Abshire*, 563 S.W.3d at 224–25 (alterations in original). There, the report clearly linked the alleged breach (failure to document a complete and accurate assessment) to the injury (paraplegia) by asserting and explaining, with reference to specific facts, how the failure to document a complete and accurate assessment resulted in a delay in proper medical care, and explaining how consequently, without spinal fusion, the delayed medical care allowed the spinal injury to progress to the point of paraplegia. *See id.*

In the case before us, morbid obesity is an objective condition readily observable by hospital staff and physicians, unlike conditions of the spine that could only be observed by a CT scan or an MRI as in *Abshire*. The absence of a written

8

preoperative assessment plan, in and of itself, is not evidence of a breach of the standard of care, nor is it evidence that such a breach actually resulted in deficient attendant care at the time that Kindle administered general anesthesia to Zubia, causing Zubia's injuries. The causal nexus between the preoperative assessment plan and death thereafter is not set out in the Dr. Hurt's report, and the report fails to provide a "straightforward link" between Kindle's alleged breach and Zubia's injury. *See id.* at 225. Dr. Hurt merely concludes that, had Kindle properly completed a preoperative assessment plan, Kindle would have been aware of the risks and "could have prevented the same." This is conclusory, however, as Dr. Hurt does not provide even a factual summary explaining how Kindle could have prevented Zubia's complications had he completed a preoperative assessment plan. *See id.*; *Zamarripa*, 526 S.W.3d at 460–61.

It is also unclear from the four corners of the report what Dr. Hurt intended when he stated, "[Kindle's] failure to become aware of the risks of complications that Elpidia Rios de Zubia was mentally, physically or physiologically exhibiting were ignored." Certainly, this court could attempt to make reasonable inferences about what Dr. Hurt might have intended to say, but courts are prohibited from making any such inferences. *See Bowie Mem'l Hosp.*, 79 S.W.3d at 52–53; *Gray v. CHCA Bayshore L.P.*, 189 S.W.3d 855, 859–60 (Tex. App.—Houston [1st Dist.] 2006, no pet.). "The court should not have to fill in missing gaps by drawing inferences or guessing as to what the expert likely meant or intended." *Tenet Hosps., Ltd. v. Garcia*, 462 S.W.3d 299, 310 (Tex. App.—El Paso 2015, no pet.). Without more, we are left to speculate as to how the failure to complete a preoperative assessment plan of an obvious condition caused Zubia's oxygenation levels to rapidly decrease. Accordingly, this does not satisfy the requirements of Section 74.351.

## II. Failure to Monitor

Dr. Hurt also contends that "[i]n addition to having a properly completed preoperative assessment and anesthesia plan, the appropriate standard of care would have been for Kristopher Kindle, CRNA, to monitor, evaluate and document Elpidia Rios de Zubia's physiological condition as was appropriate for the type of anesthesia." The facts of when and how Kindle failed to monitor "as was appropriate for the type of anesthesia" are not identified other than by what appears to be Dr. Hurt's position, expressed in his initial report, that since there was a death there must have been negligence in administering anesthesia.[1] Dr. Hurt states the obvious: that monitoring Zubia's oxygenation levels was imperative so that Kindle could treat any complications which may have arisen. Dr. Hurt then asserts that Kindle did not clinically monitor Zubia or her oxygenation levels, which were apparently declining. "As such," Dr. Hurt states, "her oxygenation levels dropped below safe levels causing her heart rate to plummet."

Here, Dr. Hurt's report similarly fails to provide facts in support and an adequate explanation of causation. In *Patterson v. Ortiz*, our sister court delineated a clear rule for this type of generalized standard of care allegation:

> [I]f the report states the breach of the standard of care by the physician or health care provider is the failure to monitor, observe, test, or evaluate, the report must explain what action the defendant physician or health care provider would have taken in response to the data obtained from the monitoring, monitoring, testing, and evaluating that should have been performed, including passing that data to another physician or health care provider who could take action that would have altered the patient's outcome. The report must explain why the action the defendant should have taken, either by itself or in coordination with the actions of others, would have prevented the patient's injury.

---

[1] In *Zubia I*, this court determined that the explanation of causation in Dr. Hurt's initial report was conclusory where he merely opined that "death doesn't make sense in this case unless there was a deviation from the standard of care as it relates to monitoring." *See Zubia I*, 2019 WL 2385771, at *4.

412 S.W.3d 833, 839–40 (Tex. App.—Dallas 2013, no pet.). There, the court found the report to be sufficient because "[t]he report specified the action Dr. Patterson should have taken in response to the results of the examination and testing: prompt hospitalization of Raul where he could receive early, aggressive treatment for his pneumonia. The report states that hospitalization with the early, aggressive treatment would have saved Raul's life." *Id.* at 842–43.

In contrast with the report in *Patterson*, Dr. Hurt's reports fail to explain what action Kindle factually did not take, that should have been taken, in response to any specific data obtained from any type of monitoring of Zubia's physiological condition and oxygenation levels. Applying the reasoning our sister court used under similar facts in *Gray v. CHCA Bayshore, L.P.*, "a literal reading of the report's most direct statements concerning breach leads to the conclusion that simply monitoring [Zubia's oxygenation levels], and taking no corrective action, would have prevented her injury." *Gray*, 189 S.W.3d at 859–60. Even then, a literal reading of Dr. Hurt's reports still does not directly lead to this conclusion because nowhere in either of his reports does Dr. Hurt (1) identify facts from the medical record indicating that Kindle did not monitor Zubia's oxygenation levels or (2) state an omitted act of care that would have in any way prevented her injuries, much less explain "why the action the defendant should have taken . . . would have prevented the patient's injuries." *Patterson*, 412 S.W.3d at 840.

In *Abshire*, the expert report documented that the patient came to the hospital five times without the relevant medical history being documented or followed up on in light of the symptoms she related to the treating physician. *See Abshire*, 563 S.W.3d at 224. The expert explained in his report that the physician failed to obtain a thorough medical history, document and link the related symptoms to that medical history, obtain CT scans and MRIs to determine if the history was relevant, and then treat the spinal injury with spinal fusion to prevent the progression to paraplegia.

11

*See id.* The expert's report was accompanied by a nurse's report of "significantly more detail," factually, and the two reports were considered together to determine whether the requirements of Chapter 74 were met. *See id.* at 227. The reports in the instant case, however, do not explain *what* action Kindle should have taken in response to unspecified data from monitoring, testing, and evaluation. Neither do the reports explain *why* the action Kindle should have taken, either by itself or in coordination with the action of others, would have prevented Zubia's death. *See Patterson*, 412 S.W.3d at 839–40. Because Dr. Hurt's statements are conclusory and do not provide facts linking Kindle's failure to monitor to Zubia's rapid oxygenation desaturation, they do not satisfy the causation requirement of Section 74.351. *See Gray*, 189 S.W.3d at 860 ("By not fleshing out how appellees' failure to monitor Gray's extremities caused her injury, the report does not convincingly tie the alleged departure from the standard of care to specific facts of the case.").

### III. Third-Year Intubation Attempt

Dr. Hurt asserts in his amended report that completing a preoperative assessment plan would have allowed Kindle to identify Zubia's Class III Mallampti score, which Dr. Hurt explained is a score used to predict the ease of endotracheal intubation—"Class I and II being the least difficult to intubate while Class III and Class IV suggests intubation is expected to be difficult." Dr. Hurt opines that because Zubia was morbidly obese and had a Mallampti score of Class III, "the appropriate standard of care would have been to not allow an inexperienced third year medical student to attempt an endotracheal intubation on Elpidia Rios de Zubia who was experiencing rapid oxygen desaturation." He asserts that completing a preoperative assessment plan would have allowed Kindle to assess and identify Zubia's conditions, including a Class III Mallampti score, "which would have prevented the endotracheal complication caused by the third year medical student."

12

Dr. Hurt then contends that "[b]ased upon [his] experience, skill, knowledge and training as a board certified anesthesiologist, Elpidia Rios de Zubia's rapid oxygen desaturation would not have occurred if Kristopher Kindle, CRNA, would not have permitted a third year medical student from attempting to perform the endotracheal intubation."

These statements suffer from the same defect as the first two theories: Dr. Hurt's opinions are conclusory and fail to provide an adequate explanation of how causation will be proven. We first note that not recording a Mallampti score does not equate (1) to a failure of Kindle to understand that an obviously obese patient will be more challenging to intubate or (2) to a failure to act on that fact. Regardless, Dr. Hurt provides no explanation whatsoever as to why completing a preoperative assessment plan "would have prevented the endotracheal complication caused by the third year medical student." This statement is wholly conclusory and does not satisfy the requirements of Section 74.351. *See Abshire*, 563 S.W.3d at 223–24; *Bowie Mem'l Hosp.*, 79 S.W.3d at 52.

Dr. Hurt also fails to provide any information explaining how or why prohibiting the third-year student from attempting intubation would have prevented the rapid oxygen desaturation.[2] He gave no information to explain causation as to the actual experience level of the student, the time documented that it took to be intubated, what desaturation levels were reached before intubation was attempted, the declined levels at successful intubation, and what and when levels became unacceptably critical. Dr. Hurt made no such assertions, and courts cannot not make

---

[2]The failure to provide an adequate explanation of causation here when the opportunity to amend was given is particularly apparent in light of the fact that Dr. Hurt expressly admitted the inverse in his original report: namely, that "[a]lthough it is [Dr. Hurt's] opinion that it was poor judgment to have allowed this attempt . . . , it appears that Ms. Zubia was quickly and successfully intubated by Kristopher Kindle, CRNA." We decline to weigh the legal effect of potentially inconsistent statements in multiple Chapter 74 reports from the same or differing experts.

such inferences. *See Bowie Mem'l Hosp.*, 79 S.W.3d at 52–53; *Tenet Hosps., Ltd.*, 462 S.W.3d at 310; *Gray*, 189 S.W.3d at 856–60. The reports do not explain *what* action Kindle would or should have taken had he not permitted the third-year student to attempt intubation. Neither do the reports explain *why* the action Kindle should have taken, either by itself or in coordination with the action of others, would have prevented Zubia's death. *See Patterson*, 412 S.W.3d at 839–40. Without more, these conclusory statements fail to factually link the alleged breach to the injury and are therefore insufficient to satisfy the causation requirements of Section 74.351. *See Bowie Mem'l Hosp.*, 79 S.W.3d at 52–53; *Tenet Hosps., Ltd.*, 462 S.W.3d at 310; *Gray*, 189 S.W.3d at 856–60.

*IV. Failure to Check Equipment*

We see nothing in Dr. Hurt's report *factually demonstrating* that equipment failed or was deficient and that such failure or deficiency of the equipment was a proximate cause of death. Dr. Hurt, however, contends that "in addition to creating a preoperative assessment plan, . . . the appropriate standard of care in this case would have been for Kristopher Kindle, CRNA, to check the anesthesia machine/equipment/monitors for 'leaks', proper calibration, and effective/working alarms." Dr. Hurt opines that these checks are done to ensure the equipment is in working order and that, if they are not checked prior to the procedure, the equipment is not a reliable source for identifying complications that may arise with the patient. This, according to Dr. Hurt, could ultimately affect the health of the patient. Dr. Hurt then claims Kindle did not check the equipment prior to Zubia's procedure, which meant that Kindle was unaware of whether the equipment was functioning properly.

While Dr. Hurt's amended report entirely fails to assert that the equipment actually failed, Dr. Hurt did state in his original report that "[c]hecking the machine for 'leaks' would have likely identified the subsequent failure of the anesthesia machine and its associated ventilator during the delivery of anesthesia." *See*

14

*Scherer v. Gandy*, No. 07-18-00341-CV, 2019 WL 988174, at *2 n.4 (Tex. App.—Amarillo Feb. 28, 2019, no pet.) (mem. op.) ("When, as here, an expert report has been supplemented, courts have considered both the original and supplemental reports in conducting an analysis of the adequacy of the reports.").[3] In his amended report, Dr. Hurt thus concludes, "[W]hen Elpidia Rios de Zubia began to experience rapid oxygen desaturation and a plummeting heart rate, the [sic] Kristopher Kindle, CRNA, was unable to respond quickly enough to the machine/equipment/monitors in order to counter Elpidia Rios de Zubia's intraoperative complications," which resulted in her death. Additionally, Dr. Hurt asserts that Kindle's failure to check the equipment caused him to be the "ultimate monitor" of Zubia's physical, mental, and physiological condition, which he relates back to Kindle's failure to clinically monitor Zubia as set forth in his second theory.

Disregarding the inconsistencies, we first note that there is nothing in his reports factually showing anything from the medical record relied upon to make the conclusion that the equipment did not perform or was a proximate cause of death. Moreover, Dr. Hurt fails to explain, factually, how or why, without record of a defect, Kindle's failure to check the equipment for any leaks or malfunctions prior to the procedure actually caused or contributed to the injury. Dr. Hurt summarily concludes that Kindle was unable to respond "quickly enough" to the equipment in order to counter Zubia's complications, but Dr. Hurt does not link Kindle's delay to his prior failure to check the equipment for leaks or malfunctions. Dr. Hurt's reports would require the trial court as well as this court to infer what was a proper time frame within the standard of care to perceive and react, that Kindle's inability to

---

[3]Although both reports may be considered in conducting our analysis, we also note that Dr. Hurt's amended report appears to abandon his prior assertion that "checking the machine for 'leaks' would have likely identified the subsequent failure." The amended report fails to make this assertion altogether and fails to use the opportunity to amend the Chapter 74 report to include any facts in support thereof.

respond within that time frame to the equipment and monitors was in fact caused by a possible malfunction or leak in the equipment, and that Kindle would have found such leak had he checked the equipment prior to Zubia's procedure. As previously pointed out, courts are prohibited from making any such inferences. *See Bowie Mem'l Hosp.*, 79 S.W.3d at 52–53; *Gray*, 189 S.W.3d at 856–60.

Additionally, Dr. Hurt's contention that Kindle's failure to check the equipment and monitors caused Kindle to be the "ultimate monitor" is conclusory for the same reasons we discussed with respect to Dr. Hurt's second standard of care; Dr. Hurt fails to explain what action Kindle should have taken in response to the equipment had it not been functioning properly and had Kindle properly monitored Zubia's oxygenation levels. *See Patterson*, 412 S.W.3d at 840. Dr. Hurt thus fails to provide a link explaining how or why checking the equipment prior to the procedure and monitoring Zubia's condition would ultimately have prevented her rapid oxygenation desaturation and changed the result for her. *See Bowie Mem'l Hosp.*, 79 S.W.3d at 52–53; *Patterson*, 412 S.W.3d at 840; *Gray*, 189 S.W.3d at 856–60. For the reasons discussed above, these statements on causation also fail to meet the requirements of Section 74.351.

*Conclusion*

Although Dr. Hurt's amended report adds verbage, for the reasons stated above, unlike the expert reports in cases like *Abshire*, Dr. Hurt's original and amended reports lack content and contain only conclusory statements on causation. *See Abshire*, 563 S.W.3d at 224–25. All that this court can conclude is that Dr. Hurt made no further explanation of causation in his amended report because he had no explanation. Therefore, the reports fail to provide the trial court with an adequate basis to determine that the case has merit. The Texas Medical Liability Act permits a trial court to grant one thirty-day extension to cure a deficiency in an expert report. *See* CIV. PRAC. & REM. § 74.351(c). The trial court in this case has already granted

16

Appellees a thirty-day extension to try to cure the deficiencies in Dr. Hurt's original report. Accordingly, we hold that the trial court abused its discretion in denying Appellants' motion to dismiss.

## This Court's Ruling

We reverse the trial court's order denying Appellants' motion to dismiss, and we render judgment dismissing with prejudice Appellees' claims against Appellants.[4]

W. BRUCE WILLIAMS
JUSTICE

September 23, 2021

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.

---

[4]*See Bowie Mem'l Hosp.*, 79 S.W.3d at 54. We note that Appellants did not request attorney's fees in the motion to dismiss that they filed in the trial court and that they have not asked this court to remand to the trial court for the consideration of attorney's fees under Section 74.351(b)(1) and, instead, have asked that this court render a judgment of dismissal. *See Turtle Healthcare Grp., L.L.C. v. Linan*, 337 S.W.3d 865, 869 (Tex. 2011) (rendition appropriate where the appellant waived its request for attorney's fees).

17