**AFFIRM; Opinion Filed March 4, 2019.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-18-00273-CV

### TEXAS INSTITUTE FOR SURGERY, L.L.P., Appellant
### V.
### ANGELA M. CARPENTER, Appellee

**On Appeal from the 134th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. Dc-17-04230**

## MEMORANDUM OPINION

Before Justices Myers, Osborne, and Nowell
Opinion by Justice Myers

This is an interlocutory appeal from the denial of a motion to dismiss under section 74.351(b) of the Texas Civil Practices and Remedies Code. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351; *see also id.* § 51.014(a)(9) (interlocutory appeal).

Angela M. Carpenter sued Texas Institute for Surgery, L.L.P. (TIS) as well as other defendants for damages she allegedly sustained from epidural steroid injections. After Carpenter served an amended expert report, TIS moved to dismiss her claims against it because the amended report did not meet the requirements for an expert report. *See id.* § 74.351(b). The trial court denied the motion to dismiss. TIS brings this interlocutory appeal contending the trial court abused its discretion by denying the motion to dismiss. We affirm the trial court's order.

## BACKGROUND

Carpenter suffers from chronic pain. To combat the pain, she received treatment from a pain-management physician, Dr. Renaud Rodrigue. As part of the pain-management treatment, Dr. Rodrigue gave Carpenter epidural steroid injections at TIS and was assisted by TIS's staff. These injections require the surgeon to bring the injection needle near the spinal cord.

According to Dr. Rodrigue's notes following the procedure, Carpenter was under general anesthesia while receiving the injections. During the procedure, Carpenter "moved vigorously." TIS's staff held her down, but she "[w]as writhing on the table" and "did move quite a lot" while Dr. Rodrigue finished the procedure. When Carpenter awoke, she complained of "mid thoracic pain (sharp and 'tingling') there and radiating to the abdomen as well." His notes also stated that after the procedure, "[f]rom the way she is acting, and given her symptoms, I fear that might be thoracic cord injury." Dr. Rodrigue sent her "per 911 for an emergency thoracic MRI."

A neurosurgeon reviewed MRI scans taken after the procedure, and he determined Carpenter "has a focal area of intrinsic injury to the spinal cord."

Carpenter brought suit against Dr. Rodrigue, the anesthetist, and TIS alleging they were negligent during the procedure. Carpenter timely served the defendants with an expert report prepared by Dr. Jay Stanford Ellis Jr. The defendants objected to the report and moved for dismissal under section 74.351. The trial court sustained the objections and granted Carpenter a thirty-day extension to serve additional expert reports to meet the requirements of section 74.351. Carpenter served defendants with Dr. Ellis's amended report. TIS objected to this report and moved for dismissal. The trial court denied the motion to dismiss.

## EXPERT-REPORT REQUIREMENT

Section 74.351 of the Civil Practice & Remedies Code provides that a plaintiff bringing a health care liability claim must serve defendants who are physicians or health care providers with

an expert report within 120 days of their answers. CIV. PRAC. § 74.351(a). The report must provide the expert's opinions regarding the standard of care, the manner in which the care rendered by the defendant failed to meet the standard, and the causal relationship between that failure and the injury, harm, or damages caused. *Id.* § 74.351(r)(6). A defendant may file objections to the report within twenty-one days after the report is served or the defendant files its answer. *Id.* § 74.351(a). If an expert report is not timely filed, the trial court must, on the defendant's motion, dismiss the health care liability claims with prejudice and award the defendant its reasonable attorney's fees and costs of court. *Id.* § 74.351(b). If the plaintiff serves an expert report that "does not represent an objective good faith effort to comply with the definition of an expert report in Subsection (r)(6)," then the court must grant a motion challenging the adequacy of the report. *Id.* § 74.351(l). The court may grant a party that serves a deficient expert report one 30-day extension to cure the deficiencies. *Id.* § 74.351(c).

For an expert report to "represent an objective good faith effort to comply with the definition of an expert report," the report must provide enough information to inform the defendant of the specific conduct the plaintiff has called into question and to provide a basis for the trial court to conclude that the claims have merit. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 879 (Tex. 2001). If a report omits any of the statutory elements of section 74.351(r)(6), it cannot be a good faith effort. *Id.* In determining whether the expert report represents a good faith effort to comply with the statutory requirements, the court's inquiry is limited to the four corners of the report. *Sanchez v. Martin*, 378 S.W.3d 581, 588 (Tex. 2012). A court may not "fill gaps" in an expert report by drawing inferences or guessing what the expert likely meant or intended. *Patterson v. Ortiz*, 412 S.W.3d 833, 835–36 (Tex. App.—Dallas 2013, no pet.).

One of the mandatory elements of a good faith report is an explanation of the causal relationship between a failure to meet the applicable standard of care and the injury, harm, or damages claimed. CIV. PRAC. § 74.351(r)(6). "A causal relationship is established by proof that the negligent act or omission was a substantial factor in bringing about the harm and that, absent this act or omission, the harm would not have occurred." *Nexion Health at Lancaster, Inc. v. Wells*, No. 05–16–00018–CV, 2016 WL 4010834, at *3 (Tex. App.—Dallas July 25, 2016, no pet.) (mem. op.). "An expert report must explain 'to a reasonable degree how and why the breach of the standard of care caused the injury.'" *Id.* (quoting *Jelinek v. Casas*, 328 S.W.3d 526, 536 (Tex. 2010)) (internal brackets and punctuation omitted). The report "must explain the basis of [the expert's] statements to link his conclusions to the facts." *Bowie Mem. Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (quoting *Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex. 1989)). "An expert's mere conclusion that "in medical probability" one event caused another differs little, without an explanation tying the conclusions to the facts, from an ipse dixit, which the supreme court has consistently criticized." *Nexion*, 2016 WL 4010834, at *3 (citing *Jelinek*, 328 S.W.3d at 539).

## STANDARD OF REVIEW

In its issue on appeal, TIS contends the trial court erred by denying TIS's motion to dismiss Carpenter's suit for failure to comply with the expert-report requirements of section 74.351. We review a trial court's order on the sufficiency of an expert report for an abuse of discretion. *Palacios*, 46 S.W.3d at 877. A court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). "Another way of stating the test is whether the act was arbitrary or unreasonable." *Id.* at 242.

–4–

To comply with the requirements of section 74.351, Carpenter served the defendants with the expert report of Dr. Ellis. After the trial court sustained the defendants' objections to the report, Dr. Ellis amended his expert report, and Carpenter served it on defendants. Defendants did not object to Dr. Ellis's qualifications. Here are the portions of Dr. Ellis's report that are relevant to TIS:

## II. FACTS OF THE CASE

Ms. Angela Carpenter was under the care of Dr. Renaud Rodrigue for chronic pain across the mid back and anterior chest. The diagnoses in the medical record from Dr. Rodrigue include thoracic radiculopathy, thoracic spondylosis and costochondritis/Tietze's syndrome. Medical records indicate Ms. Carpenter received treatment with chronic opioid therapy, costochondral/costovertebral injection, thoracic facet injection and thoracic epidural steroid injection. Ms. Carpenter carried a diagnosis of cystic fibrosis. Ms. Carpenter underwent thoracic epidural steroid injection and costovertebral joint injection and thoracic facet joint injection on several occasions. My review of the record indicates Ms. Carpenter received these procedures from Dr. Rodrigue every 3-4 months from 2013 through 2015. . . .

On December 31, 2015 Ms. Carpenter again underwent costosternal joint injection at T1, T2, T3, T4, T5, T6 and T7 bilaterally. She received costovertebral joint injection at T6-7 and T7-8, T8-9. She received thoracic epidural steroid injection, recorded at the T6-T7 level. Ms. Carpenter received general anesthesia from Thomas Huddleston, CRNA. Indications for general anesthesia during this procedure are not recorded, but a previous note from December 18, 2012 dictated by Dr. Rodrigue justifies the use of general anesthesia . . . . The procedure note on the operative dictation indicates the procedure was done in the prone position at T6-7. The note further states, "The patient tolerated the procedure well and there were no adverse events noted." The note was electronically signed by Dr. Rodrigue on December 31, 2015 at 12:06 PM. An addendum signed at 12:19 on that same date reads as follows:

> I have not yet done her note but we have already had a worrisome side effect reported by the patient just now, at 11:34 AM. Initially, she had a very dense block from the waist down which I thought was either a dense epidural or at worst, an intrathecal injection. As she moved vigorously during the procedure (which she always does), I wasn't too alarmed as this is a low risk complication of neuraxis blockade. However, about 20-30 minutes following this, she started developing mid thoracic pain (sharp and "tingling") there and radiating to the abdomen as well. I'm very concerned because she as (sic) writhing on the table and even though we were holding her

(there were several people doing this), she did move quite a lot.  But at no time did I think the needle was too deep nor did I see CSF.  Additionally, when it was clear that we are epidural, by bilateral/AP fluoro I did not feel the needle seemed to be any deeper at any point prior to this.

We always sedate Angela for these procedures per her own request (and I agree as well, as we use continuous flouro), due to the fact that injections are so exquisitely painful.  It was deemed in the balance, this was safer and indeed we had very little difficulty with prior procedures until now.  From the way she is acting, and given her symptoms, I fear that might be thoracic cord injury.  I'm sending her now, per 911 for an emergency thoracic MRI with contrast.— Renaud Rodrigue.

. . . .

MRI scan done at 1307 hrs. December 31, 2015 shows the central cord at T9 and T10 contains minimal symmetric edema.  The dorsal epidural space from T8 to T11 there is minimal patchy hematoma.  There may be a small subdural component at T10.

Ms. Carpenter underwent evaluation by Dr. Jerry Marlin, neurosurgery on January 19, 2016.  Her chief complaint was right leg weakness with tingling and paresthesias as well as thoracic spine pain.  Dr. Marlin's note indicates Ms. Carpenter made some improvement from when he first saw her in the emergency department at Dallas Presbyterian Hospital.  She completed a course of rehabilitation.  His impression includes thoracic myelopathy with epidural and subdural slight hemorrhage and paraparesis, improved.  Dr. Marlin saw Ms. Carpenter again on February 9, 2016.  She complained of some right lower extremity numbness, especially over the right lateral 3 toes and sole of her foot.  She had a slight heel drop on the right.  His impression remained the same and in his plan he states that "She has a focal area of intrinsic injury to the spinal cord in both MRI scans."  He recommended she continue with her physical therapy and rehabilitation[.]

## III. <u>STANDARD OF CARE</u>

The standard of care for a pain management physician and by extension any physician performing epidural steroid injection is to use fluoroscopy to properly place the needle and avoid injection into the spinal canal. . . . The Spine Intervention Society takes an even stronger position on the use of sedation.

There are no features of any of the procedures covered by these Guidelines that warrant preemptive or routine sedation.  Moreover, in certain procedures patients must remain awake to be able to warn of adverse events. . . . Whenever sedation is used, however, the patient must always be sufficiently alert so as to be able to recognize and warn of any impending misadventure by reporting any

unexpected, unfamiliar desired sensations. **Under no circumstances should any of the procedures be performed under general anesthesia** (emphasis in the original document)

The standard of care for a pain management physician providing conscious sedation for thoracic injection procedure is to use sedation only when necessary to facilitate the procedure. There is no evidence in the medical record that Ms. Carpenter had any special problems that would require the use of general anesthesia to successfully complete the procedure. . . . While giving sedation, the treating physician should ensure that the patient remains communicative. A patient who is unresponsive may not report symptoms of needle contact with nerve structures. The primary symptom of nerve contact is pain and the presence of severe pain is justification to terminate the procedure immediately. If at any time a patient becomes unresponsive, the procedure must be stopped until a patient can verbalize and demonstrate adequate cognitive function to report any adverse symptoms. This allows another layer of safety so the patient can communicate any significant issues experienced during the procedure. If at any time a patient begins to move one must consider the possibility of contact by the needle with the spinal cord. Holding a patient down to do a procedure is never appropriate and is not recommended by any medical society in any circumstance, especially when involving needle placement around the spinal cord. The standard of care for an operating room and hospital staff caring for patients is to use physical restraint only when medically justified and only under the order of a licensed physician. The use of restraints has received increased scrutiny over the past years. Multiple organizations including the American Hospital Association and the Joint Commission for Hospital accreditation issue guidelines about the proper use of restraints. All hospitals have such guidelines, and while there may be some individual variation, the purpose of the guidelines is to ensure that restraining patients is only done when medically necessary and under the direct order of a licensed practitioner. The need for the restraint, the type of restraint used, the expected duration of restraint use, and periodic evaluation of the need for restraint must be documented in the medical record. A written order for restraint is required, though in an emergency where patient safety is at risk, a verbal order may be issued by a licensed physician with a written order to follow afterwards. The purpose of these guidelines is to avoid the improper use of restraints which is sometimes associated with injury and physical or emotional trauma to patients.

## V. BREACHES OF THE STANDARD OF CARE

. . . .

The operating room staff of Texas Institute for Surgery, ASC breached the standard of care by holding Ms. Carpenter down while she experienced severe pain. They did so without any documentation that they were complying with guidelines on the proper use of restraints as specified by hospital policy and recognized good clinical practice. There is no order for restraint in the medical record and no documentation as to the need of restraint performed by the hospital staff. They further aggravated the situation by not recognizing Ms. Carpenter's distress as a sign of possible injection into the spinal cord. They failed in their duty to maintain safety and

–7–

avoidance of harm to [Ms.] Carpenter by not suggesting to Dr. Rodrigue that the pain experienced by [Ms.] Carpenter was due to needle trauma. Instead of terminating the procedure and assessing her well-being, they held her down to complete the procedure, a practice that is not recommended in any circumstance. The hospital staff of Texas Institute for Surgery, ASC facilitated a procedure that should have been stopped which then resulted in permanent injury to [Ms.] Carpenter.

## V. <u>CAUSATION</u>

. . . The spinal cord injury experienced by Ms. Carpenter and identified by Dr. Marlin as injury directly to the spinal cord was due to an error in technique where Dr. Rodrigue placed the needle tip into the spinal cord during general anesthesia, damaging the nervous system and leaving Ms. Carpenter with pain and disability. . . .

The operating room staff of Texas Institute for Surgery, ASC held Ms. Carpenter down during a spinal injection, despite the knowledge that such behavior could cause permanent injury. The hospital staff of Texas Institute for Surgery, ASC failed to comply with recommended guidelines and standards for application and use of patient restraint. There is no documentation of verbal or written orders for the use of restraints during this procedure. Had the staff of Texas Institute for Surgery not restrained Ms. Carpenter during the procedure, her injury could have been avoided.

## VI. <u>CONCLUSION ON CAUSATION</u>

It is my opinion, based on reasonable medical probability, that the claim against Dr. Rodrigue, Thomas Huddleston, CRNA and the Texas Institute for Surgery, ASC has merit. Dr. Rodrigue performed thoracic epidural steroid injection under general anesthesia, when all major medical societies recommend against the use of general anesthesia in an adult for this procedure. He compounded this error by not stopping the procedure when Ms. Carpenter began to writhe on the table. The needle trauma and injection into the spinal cord sustained by Ms. Carpenter would not have occurred except for the errors in judgment and technique made by Dr. Rodrigue. . . . The staff of Texas Institute for Surgery further compounded this error by holding Ms. Carpenter down during the procedure even though she was experiencing pain and lack of cooperation which is a major symptom of injection into the spinal cord. The needle trauma and injection into the spinal cord sustained by Ms. Carpenter would not have occurred except for the errors in technique and judgment made by Thomas Huddleston, CRNA and the staff of Texas Institute for Surgery, ASC.

### CAUSATION

In the trial court and on appeal, TIS argued Dr. Ellis's expert report failed to explain how

TIS's breach of the standard of care proximately caused Carpenter's damages. The report states

the TIS staff breached the standard of care in two ways: (1) by holding Carpenter down while she was moving on the table and (2) "by not suggesting to Dr. Rodrigue that the pain experienced by [Ms.] Carpenter was due to needle trauma." Carpenter's damages resulted from "a focal area of intrinsic injury to the spinal cord," which Dr. Ellis described as "needle trauma and injection into the spinal cord."

TIS argues that Dr. Ellis's report states the pain that started Carpenter's writhing was the needle trauma from Dr. Rodrigue's misplacement of the needle. TIS asserts, "Dr. Ellis opines that the 'holding down' of Carpenter came about due to the patient writhing in pain—pain he believes occurred from 'needle trauma to the spinal cord.'" Since the needle trauma started her writhing, TIS asks, "how did the 'holding down' of Carpenter cause a needle to penetrate her spinal cord? Or conversely, how would a lack of 'holding down' have avoided the injury?" TIS asserts the report "never connects the dots and never links TIS's conduct to Carpenter's harm." Instead, TIS argues, "the breach of holding down the patient occurred after the injury occurred. . . . If the breach came about after the injury, by definition, it did not cause the injury." The report's statement that the staff breached the standard of care by not suggesting to Dr. Rodrigue that Carpenter's writhing was due to needle trauma is subject to the same arguments. If the writhing was caused by needle penetration and injection, then any statements the staff should have made to Dr. Rodrigue after Carpenter began writhing would have been made after the injury occurred and could not be a proximate cause of the injury. TIS asserts the trial court could not find the expert report sufficient unless it improperly drew inferences to fill in these analytical gaps. *See Patterson*, 412 S.W.3d at 835–36.

Although the connection between TIS's conduct and Carpenter's harm could have been presented more clearly in the report, it is present.

Key to TIS's argument is its assertion that the staff did not hold Carpenter down until after the needle penetrated her spinal cord. The report does not say that. The report, which includes Dr. Rodrigue's notes, states Carpenter "moved vigorously during the procedure (which she always does)." The staff held her down, but she was writhing "even though we were holding her." The trial court could interpret the report as stating (1) Carpenter "moved vigorously," (2) the staff held her down, and (3) as they held her, her "mov[ing] vigorously" escalated to "writhing on the table." The report states, "The primary symptom of nerve *contact* is pain . . . ," and "[i]f at any time a patient begins to move one must consider the possibility of *contact* by the needle with the spinal cord." (Emphasis added.) The report does not state when the needle actually penetrated the spinal cord as opposed to contacting it or when the injection into the spinal cord occurred. But the report does state, "a moving patient being restrained can result in needle movement *into* the substance of the spinal cord. The needle can easily penetrate the spinal cord during the events described in Ms. Carpenter's medical record." (Emphasis added.) The report also states the staff "held Ms. Carpenter down during a spinal injection, despite the knowledge that such behavior could cause personal injury. . . . Had the staff . . . not restrained Ms. Carpenter during the procedure, her injury could have been avoided."

The trial court could have read the report as stating needle *contact* with the spinal cord created the pain that caused Carpenter to "move[] vigorously." Because Carpenter "always" "moved vigorously" during these procedures, the trial court could conclude that penetration had not yet occurred. Due to her vigorous movement, the staff restrained her. As the staff held her down, she was "writhing on the table," which "indicates the distinct possibility that she was experiencing severe pain, such as that associated with needle trauma to the spinal cord." The trial court could conclude the "needle trauma to the spinal cord" as she was writhing was the "injection into the spinal cord." The trial court could further read the report as stating that Carpenter's injury

–10–

could have been avoided if the staff had not restrained her when she was initially moving and had instead advised Dr. Rodrigue to terminate the procedure and assess Carpenter's condition before penetration of the needle and injection into the spinal cord occurred. If the report is read in that manner, the temporal contradictions asserted by TIS do not arise. Such a reading does not require adding any information, drawing improper inferences, or engaging in any impermissible "gap filling."

Dr. Ellis's report provides sufficient information to inform TIS of the specific conduct that Carpenter has called into question and to provide a basis for the trial court to conclude that the claims have merit. Therefore, Dr. Ellis's report represents a good-faith effort to comply with section 74.351. *See Palacios*, 46 S.W.3d at 879. We conclude the trial court did not abuse its discretion by denying TIS's motion to dismiss. We overrule TIS's issue on appeal.

## CONCLUSION

We affirm the trial court's order denying TIS's motion to dismiss.

/Lana Myers/
LANA MYERS
JUSTICE

180273F.P05

–11–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

TEXAS INSTITUTE FOR SURGERY, L.L.P., Appellant

No. 05-18-00273-CV          V.

ANGELA M. CARPENTER, Appellee

On Appeal from the 134th Judicial District Court, Dallas County, Texas
Trial Court Cause No. DC-17-04230.
Opinion delivered by Justice Myers.
Justices Osborne and Nowell participating.

In accordance with this Court's opinion of this date, the order of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee ANGELA M. CARPENTER recover her costs of this appeal from appellant TEXAS INSTITUTE FOR SURGERY, L.L.P.

Judgment entered this 4th day of March, 2019.