**Affirmed; Opinion Filed November 15, 2019.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

_____

### No. 05-18-01073-CV
_____

**METHODIST HOSPITALS OF DALLAS D/B/A METHODIST HEALTH SYSTEM AND D/B/A METHODIST DALLAS MEDICAL CENTER, Appellant**

**V.**

**JESUS NIETO, RICHARDO FELIPE NIETO, JESSE NIETO, AND ORLANDO NIETO, EACH INDIVIDUALLY AND AS HEIRS OF THE ESTATE OF MARY JESSIE ALVAREZ, DECEASED, Appellees**

**On Appeal from the 193rd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-18-02115**

## MEMORANDUM OPINION

Before Justices Myers, Osborne, and Nowell
Opinion by Justice Myers

We withdraw our opinion and judgment issued August 22, 2019, and substitute the following opinion and judgment in their place.

In consolidated interlocutory appeals, appellant Methodist Hospitals of Dallas d/b/a Methodist Health System and d/b/a Methodist Dallas Medical Center (Methodist) challenges the trial court's orders denying its first and second motions to dismiss the health care liability claims of appellees Jesus Nieto, Richardo Felipe Nieto, Jesse Nieto, and Orlando Nieto, each individually and as heirs of the estate of Mary Jessie Alvarez, deceased (the Nietos). Methodist argues that the trial court abused its discretion in denying the motions to dismiss because the expert reports were so lacking in substance they constituted "no report" at all, and because the amended expert report

did not address how and why the actions or inactions of Methodist and its nurses caused the premature discharge of Mary Jessie Alvarez (Mrs. Alvarez). We affirm.

## BACKGROUND AND PROCEDURAL HISTORY

On February 15, 2016, Dr. Theresa Patton, M.D., assisted by Dr. Melodi Reese-Holley, M.D., performed a robotic-assisted total laparoscopic hysterectomy with bilateral salpingectomy on Mary Jessie Alvarez at the Methodist Dallas Medical Center. The procedure began at 12:39 p.m. and ended at 2:40 p.m., and following post-operative recovery, Mrs. Alvarez was discharged at 8:30 p.m. She continued to experience severe pain after arriving home, and the next day her husband called the doctors' surgical practice, Kessler Women's Healthcare, and complained that his wife was suffering severe post-surgical pain. Dr. Reese-Holley instructed Mr. Alvarez to double his wife's pain medication. Mrs. Alvarez's family discovered her in a state of "extreme distress" early on the morning of February 17, 2016. After she was transported to Arlington Memorial Hospital, resuscitative efforts failed and Mrs. Alvarez was pronounced dead at 9:24 a.m. on February 17, 2016. The cause of death was peritonitis and small bowel perforation.

Mrs. Alvarez's husband and children (the Nietos), the appellees in these consolidated appeals, filed suit against the two doctors who performed the surgery, their surgical practice, and appellant Methodist. The Nietos pleaded negligence causes of action against Dr. Patton, Dr. Reese-Holley, Kessler Women's Healthcare, and Methodist. The Nietos' negligence claims against Methodist included both direct and vicarious claims. The Nietos alleged that Methodist's "acts and/or omissions" were "singularly and/or severally a proximate cause of the occurrence in question and resulted in Decedent's death and damages to Plaintiffs." The Nietos asserted both survival and wrongful death claims and sought actual damages.

The Nietos timely served expert reports prepared by Dr. Steven McCarus, M.D., and Patricia Spellman-Foley, R.N. Methodist filed objections to these expert reports and moved to

dismiss, arguing they were so deficient regarding causation they constituted "no report" at all as to Methodist. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(b). The trial court held a hearing on the motion to dismiss and it signed an order on August 27, 2018, granting the Nietos a thirty-day extension of time to cure any deficiencies. *See id*. § 74.351(c). The trial court's order granting the thirty-day extension is the subject of Methodist's first accelerated interlocutory appeal, docketed under appellate cause number 05–18–01073–CV.

The Nietos timely filed an amended report from Dr. McCarus, and Methodist again challenged it as inadequate and moved to dismiss. The trial court held a hearing on the second motion to dismiss and on October 29, 2018, it signed an order denying Methodist's second motion. Methodist filed another accelerated, interlocutory appeal from that order, and this second appeal was originally docketed under appellate cause number 05–18–01381–CV.

On April 10, 2019, this Court consolidated appellate cause number 05–18–01381–CV into cause 05–18–01073–CV, and transferred all documents in cause 05–18–01381–CV (which is now a closed case) into cause number 05–18–01073–CV.

## DISCUSSION

### 1. First Motion to Dismiss

In its first interlocutory appeal, Methodist asserted that the trial court abused its discretion in denying Methodist's first motion to dismiss because the Nietos' expert reports failed to provide a causal link between any acts or omissions by Methodist or its staff and the injuries allegedly sustained by Mrs. Alvarez. Hence, the reports were so lacking in substance they constituted "no report" as to Methodist, and the trial court had no discretion but to dismiss the case with prejudice.

We review a trial court's decision denying a motion to dismiss based on the adequacy of an expert report for an abuse of discretion. *Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 223 (Tex. 2018) (per curiam). A trial court abuses its discretion if it acts without reference to

guiding rules or principles. *Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 142 (Tex. 2015). In analyzing a report's sufficiency under this standard, we consider only the information contained within the four corners of the report. *Abshire*, 563 S.W.3d at 223.

Chapter 74 of the Texas Civil Practice and Remedies Code, also known as the Texas Medical Liability Act (TMLA), requires health care liability claimants to serve an expert report upon each defendant not later than 120 days after that defendant's answer is filed. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a); *Abshire*, 563 S.W.3d at 523. Under the Act, a defendant is entitled to dismissal of a healthcare liability claim if, within 120 days of filing suit, the defendant is not served with an expert report showing the claim has merit. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a), (b); *Post Acute Medical, LLC v. Montgomery*, 514 S.W.3d 889, 892 (Tex. App.— Austin 2017, no pet.). The Act has specific requirements for an adequate expert report and requires "an objective good faith effort" be made to comply with the requirements, but it also authorizes the trial court to grant one thirty-day extension for the claimant to cure deficiencies in an otherwise timely filed expert report. *See id*. § 74.351(c), (l); *Post Acute Medical*, 514 S.W.3d at 892. "The trial court should err on the side of granting the additional time and must grant it if the deficiencies are curable." *Post Acute Medical*, 514 S.W.3d at 892 (footnotes omitted).

"Section 74.351 distinguishes between a report that is timely served but deficient and when no report is served." *Villarreal v. Fowler*, 526 S.W.3d 633, 635 (Tex. App.—Fort Worth 2017, no pet.). "If a report is timely served but deficient, the trial court may grant an extension to cure the deficiency, and no appeal lies from the extension order." *Id*. (citing TEX. CIV. PRAC. & REM. CODE ANN. §§ 74.351(c), 51.014(a)(9); *Ogletree v. Matthews*, 262 S.W.3d 316, 320–21 (Tex. 2007)); *see also Taton v. Taylor*, No. 02–18–00373–CR, 2019 WL 2635568, at \*8 (Tex. App.— Fort Worth June 27, 2019, no pet.) (mem. op). If, however, no report "is timely served, the trial court has no option but to dismiss the claim, and an appeal lies from the trial court's failure to do

so, even if it grants an extension." *Villareal*, 526 S.W.3d at 636 (citing TEX. CIV. PRAC. & REM. CODE ANN. §§ 74.351(b), 51.014(a)(9); *Badiga v. Lopez*, 274 S.W.3d 681, 685 (Tex. 2009)).

In distinguishing between a deficient report and no report at all, we are guided by the Texas Supreme Court's decision in *Scoresby v. Santillan*, 346 S.W.3d 546 (Tex. 2011). "While the Act thus contemplates that a document can be considered an expert report despite its deficiencies, the Act does not suggest that a document utterly devoid of substantive content will qualify as an expert report." *Id*. at 549. The court has established the following standard for determining whether a deficient report is curable:

> We conclude that a thirty-day extension to cure deficiencies in an expert report may be granted if the report is served by the statutory deadline, if it contains the opinion of an individual with expertise that the claim has merit, and if the defendant's conduct is implicated. We recognize that this is a minimal standard, but we think it is necessary if multiple interlocutory appeals are to be avoided, and appropriate to give a claimant the opportunity provided by the Act's thirty-day extension to show that a claim has merit.

*Id*. at 557; *Post Acute*, 514 S.W.3d at 892.

The first report submitted by Dr. McCarus, a board certified obstetrician-gynecologist and a gynecologic surgeon, opined regarding the premature discharge of Mrs. Alvarez following the severe bowel perforation and the clinical significance of this delay in the recognition and treatment of her condition. Dr. McCarus described his qualifications as follows:

> My name is Steven McCarus, M.D. I am Board Certified in OB/GYN, currently licensed to practice medicine in the state of Florida. My office is located at 380 Celebration Place, Celebration, Florida 34747. I am currently in active, full-time, practice. A copy of my curriculum vitae is attached to this report, which more fully discusses my background and credentials and is fully incorporated. I am familiar with the standards of care as they apply to the surgical care provided by Theresa M. Patton, M.D. and Melodi Reese-Holley, M.D. I am familiar with these standards based upon my education, training, years of experience, and board certification in OB/GYN.
>
> I am familiar with the surgical standard of care applicable to the management of patients and potential and/or actual surgical complications during robotic hysterectomies. As an ob/gyn, I have cared for numerous patients with the same or similar clinical circumstances such as those Mrs. Alvarez presented with [sic]. The

standard of care requires that surgeons act as reasonable and prudent physicians and health care providers in their patient care.

As a gynecologic surgeon, I am also familiar with postoperative complications of surgical patients including but not limited to bowel perforation and the potential for peritonitis. As a trained and experienced surgeon, I have education, training, and experience with this complication. As a trained and experienced obstetrician, I have knowledge of the potential signs and symptoms and when additional studies or referrals are needed in order to properly evaluate the patient.

I am currently Chief of the Division of Gynecologic Surgery at Florida Hospital Celebration Health and Associate Professor in the Department of OB/GYN at the University of Central Florida.

Dr. McCarus discussed the standard of care for a gynecological surgeon, and opined that the care provided to Mrs. Alvarez by Theresa Patton, M.D., and Melodi Reese-Holley, M.D., was deficient, falling below the standard of care, and that they each had a duty to provide ordinary care to Mrs. Alvarez. Also, this negligent breach in the standard of care contributed substantially to the direct and proximate cause of the development of peritonitis and subsequent demise of Mary Alvarez.

Addressing proximate cause, Dr. McCarus concluded:

In my opinion, to a reasonable degree of medical certainty, each and all of the violations of the standard of care discussed herein were a proximate cause of the damage, injuries, and the eventual death of Mrs. Alvarez. It was foreseeable that failing to properly visualize the surgical field for a patient, like Mrs. Alvarez, would result in a severely perforated bowel. Within reasonable medical probability, based on the patient's development of peritonitis and sepsis following the hysterectomy procedure, and the findings of the medical examiner, the bowel perforation was caused intraoperatively during the robotic hysterectomy procedure. Because this bowel perforation was not diagnosed and treated in a timely fashion, and the patient was discharged from the hospital, unmonitored, within hours of the injury being sustained, Mrs. Alvarez's medical emergency continued to evolve into peritonitis and septic shock on February 16, 2016. By the time Mrs. Alvarez received emergency medical treatment, she was in septic shock and was experiencing multi-system organ failure leading to her ultimate demise.

The violations of the standard of care in the failure to maintain direct vision of the surgical field and failure to perform a look around following the procedure to rule out injury led to the rapid development of sepsis, peritonitis and septic shock from which Mrs. Alvarez was unable to recover. The failure of Drs. Patton and Reese-Holley to appropriately perform the robotic hysterectomy while maintaining direct visualization at all times lead to the severe bowel perforation and untimely death.

If the surgical field had been appropriately visualized, in reasonable medical probability, the blunt trauma and resulting severe bowel injury would have either been avoided completely or appropriately recognized and repaired intraoperatively with minimal subsequent complications, if any.

In conclusion, the violations of the standard of care herein proximately caused the severe perforation of Mrs. Alvarez's bowel that ultimately resulted in sepsis, septic shock, peritonitis, and multi-organ failure, causing her untimely death.

Nurse Spellman-Foley's report identified the applicable standards of nursing care and violations of that standard of care by Methodist employees that allegedly contributed to Mrs. Alvarez's premature and unmonitored discharge. Here are the portions of her report that are relevant to the motions to dismiss:

### Standards and Violations of Nursing Postanesthesia Care

Hysterectomy is a surgical procedure with a risk of internal bleeding and impaired urinary elimination due to mechanical trauma or surgical manipulation. Therefore, post-surgical care requires monitoring the patient for complications with a focus on ineffective tissue perfusion, deficiency in fluid volume and acute pain. The standard of care for assessing for ineffective tissue perfusion is evidenced by changes in skin color, bleeding, temperature, pulse pressure and urinary output. The standard of care in assessing for deficient fluid volume is evidenced by fever, diminished urinary output and tachycardia. The standard of care required for assessing acute pain is evidenced by verbal reports, muscle guarding and changes in vital signs.

In this case, Marla D. Curry, RN and Jane M. Swanson, RN failed to examine the abdomen for tenderness by palpation and distention, especially when the patient consistently made compliant [sic] of abdominal pain ("5/10"). Any guarding, rigidity, mass and distention should have been noted including fluid balance with intake and output measurements. In this case, the nursing team at Methodist Dallas Medical Center fell below the standard of care by conducting inadequate and untimely gastrointestinal post-op assessments of Mrs. Alvarez which ultimately lead to premature discharge and unmonitored development of peritonitis.

The standard of care for post-op genitourinary assessment requires the patient to void at least 250 ml of urine prior to discharge for same-day surgery patients. Urine volume below the minimum threshold amount indicates inadequate vascular volume and the potential for acute renal failure. It is standard to note the amount and color of urine, including the presence of blood in urine at all times. The standard of care also requires the use of bladder scanner [sic] to detect retained urine in the bladder.

In this case, Marla Curry, RN reported that, during Mrs. Alvarez's two hour stay in PACU [post-anesthesia care unit], she did not void before leaving PACU for the ward. And while she was at the ward, only an hour before her discharge about 1900,

Jane Swanson, RN, noted that Mrs. Alvarez voided a very small amount of urine with complaint of burning sensation. Nurse Swanson further noted that she assisted Mrs. Alvarez to the bathroom and she was unable to void and that patient was very drowsy. The chart notations indicate that the nursing team was very much aware of the fact that the patient was not voiding adequately post-op and prior to discharge.

Since urinary retention result from complicated surgery procedures such as hysterectomy, at least, a bladder scan should have been performed to measure the amount of urine in the bladder to assess for cause of urinary retention. Mrs. Alvarez's verbal statement of "I feel like my bladder is empty" is inadequate to measure urinary retention. The standard of measuring urine by bladder scanning should have been implemented to rule-out urinary retention to prevent complications. Furthermore, the compliant [sic] of a burning sensation indicated concentrated urine and likely development of infection, requiring adequate monitoring to prevent peritonitis. After five hours of post-surgical procedure, it was reported that Mrs. Alvarez voided only a small amount of urine which was well below the standard of 250 ml prior to discharge. Mrs. Alvarez did not meet the clinical pathway for same-day discharge and there is no recorded documentation of any advanced practice providers being notified of Mrs. Alvarez's failure to meet milestones. Due to the inadequate assessment of the genitourinary system, the nursing team fell below the standard of care which led directly to premature discharge and unmonitored development of peritonitis.

The patient's vital signs at an interval determined by the facility and according to the patient's condition is essential in the post-surgical care. It is important for the patient to achieve normothermia at all times and before discharge to rule-out infection or sepsis. It is the standard requirement that the patient's blood pressure, pulse and respiratory rate should remain within 20% of pre-operative baseline. Vital signs should focus on pulse rate to note tachycardia for pain and possible perforation or emerging symptoms of fluid volume deficit.

In this case, during Phase II assessment, Mrs. Alvarez was noted to have had tachycardia as documented by Jane Swanson, RN. Her heart rate increased to 102 with consistent complaints of abdominal pain, but Jane Swanson, RN did not conduct any intervention or assessment to rule-out complications. Accordingly, Mrs. Alvarez did not meet the clinical pathway for same-day discharge and there is no recorded documentation of any advanced practice providers being notified of Mrs. Alvarez's failure to meet milestones. Due to the inadequate vital signs assessment, the nursing team at Methodist Dallas Medical Center fell below the standard of care which directly lead to premature discharge and unmonitored development of peritonitis.

Finally, the standard of care requires that patients may be discharged from the post-surgical only when they are physiologically ready. Among patient teaching on infection, bleeding and emergency room access, the patient's pain level should be evaluated and acceptable before discharge. Nausea should be at a minimum before discharge. Documentation of all intake and output, including adequate urinary and GI should be noted. In this case, Mrs. Alvarez was in active pain and with no adequate urinary output before discharge only five hours after surgery. Discharging

a patient after five hours of surgical operation under these circumstances was not indicated and this patient did not meet the clinical pathway guidelines for outpatient discharge. Furthermore, Mrs. Alvarez did not meet the clinical pathway for same-day discharge and there is no recorded documentation of any advanced practice providers being notified of Mrs. Alvarez's failure to meet milestones. Mrs. Alvarez should have been admitted and monitored overnight until clinically indicated. Therefore, due to the inadequate assessment and premature discharge, the nursing team fell below the requisite standard of care.

**Conclusion**

It is my opinion that the nursing staff at Methodist Dallas Medical Center failed to timely and appropriately discharge Mrs. Alvarez from the post-surgical unit. Furthermore, the nursing staff at Methodist Dallas Medical Center failed to timely recognize and treat the signs and symptoms of small bowel perforation, which ultimately lead to development of peritonitis, septic shock and Mrs. Alvarez's eventual demise. The failure to timely and appropriately assess and monitor the patient, in addition to the failure to identify and properly treat her post-surgical complications, was a departure from the accepted standard of nursing care. It is my opinion, to a reasonable degree of medical probability, that appropriate post-op assessment and monitoring of Mrs. Alvarez would have led to the discovery of severe post-surgical complications related to her severe bowel perforation. The failure of Methodist Hospital nurses to properly assess and monitor Mrs. Alvarez and administer post-surgical care fell below the requisite standard of care.

All of the opinions expressed in this report are based on my review of the medical records from Methodist Dallas Medical Center and I reserve the right to modify and/or supplement any opinions contained herein.

Methodist asserts that Dr. McCarus, the causation expert, offered no causation opinion linking the alleged breach of the standard of care by Methodist or its nurses to the injuries, harm, and damages claimed by the Nietos. Thus, Methodist argues, his report constituted "no report" at all as to Methodist. The Nietos do not dispute that Dr. McCarus's first report was inadequate regarding causation, but they maintain that the combined expert reports were nonetheless a good faith effort to satisfy the statutory requirement, and that they were not "utterly devoid of substantive content." *See Scoresby*, 346 S.W.3d at 549. We agree. *Scoresby* characterizes the standard for granting a thirty-day extension as "minimal" and "lenient," and that an opinion's inadequacies are deficiencies a plaintiff should be given a chance to cure if it is possible to do so. *Id.* at 549, 557. Moreover, the statutory expert report requirements exist in part "to deter frivolous

claims, not to dispose of claims regardless of their merits." *Id*. at 554.

Although Dr. McCarus's first report was deficient regarding the causation element, we are not convinced dismissal was required. Spellman-Foley's report opined on all three of the required elements of an adequate expert report under chapter 74: the standard of care that the Methodist nursing staff owed to Mrs. Alvarez; the manner in which that standard of care was breached; and that the breach of the standard of care ultimately lead to the development of peritonitis, septic shock, and to Mrs. Alvarez's eventual demise. There is no question Spellman-Foley's report was deficient in that the TMLA requires a physician to opine regarding causation, *see* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(5)(C); but while Spellman-Foley's report was deficient, the Nietos' combined expert reports did not entirely fail to address the causation element. Spellman-Foley was simply not qualified to address the causation element, and this was a deficiency the Nietos should have been given an opportunity to cure. *See Scoresby*, 346 S.W.3d at 449 ("An individual's lack of relevant qualifications and an opinion's inadequacies are deficiencies the plaintiff should be given an opportunity to cure if it is possible to do so."); *see also Kerr v. Pirf Operations, LLC*, No. 05-18–00928–CV, 2019 WL 4027075, at *8 (Tex. App.—Dallas Aug. 27, 2019, pet. filed) (mem. op.) (concluding chapter 74 expert report from nurse practitioner was deficient insofar as TMLA requires a physician to opine as to causation but report did not entirely fail to address the causation element, nurse was just not qualified to render that opinion; and this was a deficiency the appellant should have been allowed to cure).[1]

Therefore, we conclude the Nietos satisfied the above standard and that the trial court did

---

[1] It should be noted that in *Columbia N. Hills Hosp., Subsidiary, L.P. v. Tucker*, No. 05–14–00056–CV, 2014 WL 7247401, at *6 (Tex. App. —Dallas Dec. 22, 2014, no pet.) (mem. op.), which is cited by Methodist, we reversed a trial court's order denying the Columbia North Hills Hospital's second motion to dismiss and rendered judgment dismissing Tucker's claims, stating in part that the nurse could not supply the necessary causation opinion because she was not a physician. However, the procedural posture of the case was different than the situation we face here. The trial court had already granted Tucker one extension of time to cure the defects in her expert reports, and no further extensions of time were available. *See id*.; *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(c). In this case, the Nietos were not previously given an opportunity to cure the defects in their expert reports.

not abuse its discretion in granting the Nietos a thirty-day extension to cure the deficiencies in their expert reports. *See Scoresby*, 346 S.W.3d at 549 (Chapter 74's "lenient standard avoids the expense and delay of multiple interlocutory appeals and assures a claimant a fair opportunity to demonstrate that his claim is not frivolous."); *Wheeler v. Methodist Richardson Med. Ctr.*, 05–17–00332–CV, 2017 WL 6048153, at *4 (Tex. App.—Dallas Dec. 7, 2017, pet. denied) (mem. op.). Because the trial court granted an extension of time to cure the deficiencies in the expert reports originally filed by the Nietos, we lack jurisdiction over the trial court's implicit denial of Methodist's first motion to dismiss, and we dismiss Methodist's issue. *See Certified EMS, Inc. v. Potts*, 355 S.W.3d 683, 689 (Tex. App.—Houston [1st Dist.] 2011) (dismissing issues related to defendant's interlocutory appeal of trial court's denial of defendant's first motion to dismiss because original reports were sufficient to implicate defendant's conduct and because trial court granted an extension of time to cure deficiencies in original reports; thus, court lacked jurisdiction over the appeal of the denial of the first motion to dismiss) (opinion on rehearing), *aff'd on other grounds*, 392 S.W.3d 625 (2013).

### 2. Second Motion to Dismiss

In its second interlocutory appeal, Methodist argued the trial court abused its discretion in denying Methodist's second motion to dismiss because the expert reports did not address how and why the actions or inactions of Methodist and its nurses caused the premature discharge of Mrs. Alvarez. Thus, we should reverse the trial court's order and dismiss the Nietos' health care liability claims against Methodist with prejudice, and remand this case to the trial court for a determination of reasonable attorneys' fees.

"[T]he purpose of the expert report requirement is to weed out frivolous malpractice claims in the early stages of litigation, not to dispose of potentially meritorious claims." *Abshire*, 563 S.W.3d at 223. An expert report is sufficient under the Act if it "provides a fair summary of the

expert's opinions . . . regarding applicable standards of care, the manner in which the care rendered . . . failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6); *Abshire*, 563 S.W.3d at 523. "Importantly, the trial court need only find the report constitutes a 'good faith effort' to comply with the statutory requirements." *Abshire*, 563 S.W.3d at 523; *see* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(l). The report is adequate if it contains sufficient information (1) informing the defendant of the specific conduct called into question, and (2) providing a basis for the trial court to conclude the claims have merit. *Abshire*, 563 S.W.3d at 523; *Baty v. Futrell*, 543 S.W.3d 689, 693–94 (Tex. 2018). A report need not marshal all of the claimant's proof, but a report that merely states the expert's conclusions about the standard of care, breach, and causation is insufficient. *Abshire*, 563 S.W.3d at 223.

One expert need not address the standard of care, breach, and causation; multiple expert reports may be read together to determine whether the requirements have been met. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(i); *Abshire*, 563 S.W.3d at 223. An expert report that adequately addresses at least one pleaded liability theory satisfies the statutory requirements, and the trial court must not dismiss in such a case. *Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 632 (Tex. 2013). A court may not "fill gaps" in an expert report by drawing inferences or guessing what the expert likely meant or intended. *Patterson v. Ortiz*, 412 S.W.3d 833, 835–36 (Tex. App.—Dallas 2013, no pet.). But a report's adequacy does not depend on the use of any particular "magic words." *See Baty v. Futrell*, 543 S.W.3d 689, 693 (Tex. 2017). Moreover, an adequate expert report does not have to meet the same standards as the evidence offered in a summary judgment proceeding or at trial. *See Miller v. JSC Lake Highlands Operations, LP*, 536 S.W.3d 510, 517 (Tex. 2017) (per curiam).

In this case, we must look to both Dr. McCarus's amended report and Nurse Spellman-

Foley's report to determine whether the trial court abused its discretion in concluding that those reports, considered together, demonstrated a good faith effort to comply with the Act's requirements. *See Abshire*, 563 S.W.3d at 223–24. Methodist argues that the causation opinion presented by the Nietos is conclusory because it never establishes what signs and symptoms would have caused a doctor to postpone discharge or otherwise be concerned for the health of Mrs. Alvarez at or before her discharge. To the extent Spellman-Foley presented examples of actions that the nurses could have taken, it was up to Dr. McCarus to explain how and why those actions would have changed the outcome. Dr. McCarus, in other words, was required to explain how proper assessment and monitoring would have changed the physician's decision to discharge. Even if Spellman-Foley's report accurately and sufficiently established the nurses' standard of care and the breaches of that standard, it was, argues Methodist, the responsibility of Dr. McCarus to "'convincingly tie the alleged departure from the standard of care to specific facts of the case.'" *Hickory Trail Hosp., L.P. v. Webb*, No. 05–16–00663–CV, 2017 WL 677828, at *7 (Tex. App.—Dallas Feb. 21, 2017, no pet.) (mem. op.) (quoting *Gray v. CHCA Bayshore L.P.*, 189 S.W.3d 855, 855 (Tex. App.—Houston [1st] 2006, no pet.)).

Spellman-Foley opined regarding the following standards of nursing care and how they were allegedly breached: (l) Methodist nurses Marla D. Curry and Jane M. Swanson failed to examine Mrs. Alvarez's abdomen for tenderness by palpation and distention, even when the patient consistently complained about abdominal pain; (2) the nursing team at Methodist conducted inadequate and untimely gastrointestinal post-operative assessments of Mrs. Alvarez—i.e., monitoring her urine output and using a bladder scanner to detect retained urine in the bladder—that ultimately led to premature discharge and unmonitored development of peritonitis; (3) the nursing team at Methodist failed to notify any advanced practice providers regarding Mrs. Alvarez's failure to meet the clinical pain-control discharge milestones; (4) the nursing team at

Methodist failed to notify any advanced practice providers regarding Mrs. Alvarez's failure to meet genitourinary discharge milestones; and (5) Mrs. Alvarez did not meet the clinical pathway guidelines for same-day outpatient discharge and there is no recorded documentation of any advanced practice providers being notified of Mrs. Alvarez's failure to meet same-day outpatient discharge milestones; and (6) the nursing team at Methodist failed to timely and appropriately assess and monitor Mrs. Alvarez, in addition to failing to identify and properly treat her post-surgical complications, and an appropriate post-operative assessment and monitoring of Mrs. Alvarez would have led to the discovery of severe post-surgical complications related to her severe bowel perforation.

According to the Nietos, the following portion of Dr. McCarus's amended report—an addition to the discussion of proximate cause in the original report—linked the alleged failures to observe and/or report identified in Spellman-Foley's report to Mrs. Alvarez's injuries and eventual death:

> For additional clarification, I reviewed the expert report of Patricia Spellman-Foley, RN dated June 21, 2018, who opined at length regarding the multiple failures by Methodist Dallas to timely and appropriately monitor and assess Mary Alvarez post-operatively. The failures to appropriately observe, monitor, and assess this postoperative patient resulted in Mary Alvarez being prematurely discharged from the hospital within hours of the injury being sustained. The multiple violations of the standard of care that led to premature discharge resulted in the unmonitored development of peritonitis and septic shock, and, in reasonable medical probability, were a proximate cause of the damage, injuries, and the eventual death of Mrs. Alvarez. Due to Mary Alvarez's subsequent development of peritonitis, septic shock, and related deterioration, has [sic] she been appropriately observed, monitored and assessed at Methodist Dallas, in reasonable medical probability, her injury would have been discovered before her condition became life-threatening and appropriate intervention would have likely prevented her demise.

We conclude that the Nietos' expert reports, considered together, demonstrate a good faith effort to comply with the statutory requirements. *See Abshire*, 563 S.W.3d at 223–24.[2]  Nurse

---

[2] Methodist does not challenge Nurse Spellman-Foley's statement of the standard of care or the nurses' alleged breaches of it. It challenges Dr. McCarus's opinion on causation, arguing in part that to the extent Spellman-Foley opined "about inappropriate

Spellman-Foley described the breaches of the standards of care and the nursing staff's role in Mrs. Alvarez's premature discharge. Her opinions on the standard of care and breach, which Methodist does not challenge, are directed at the nurses' alleged substandard, post-operative monitoring and reporting of Mrs. Alvarez's condition to the physicians who made the decision of when she was to be discharged. Dr. McCarus's amended report draws a direct line from the nurses' failure to properly document and report Mrs. Alvarez's condition, to a delay in diagnosis and proper treatment of the sepsis, and to her eventual death. *See id.* at 225. He opined that if she had been "appropriately observed, monitored and assessed at Methodist Dallas, in reasonable medical probability, her injury would have been discovered before her condition became life-threatening and appropriate intervention would have likely prevented her demise." This draws a direct causal link between the Methodist nurses' failure to meet their standard of care in observing and monitoring Mrs. Alvarez and—based on the monitoring they did conduct, which showed that she failed to meet the criteria for discharge—Mrs. Alvarez's premature discharge. It also linked the premature discharge to her cause of death, stating that allowing the unmonitored development of a rapidly evolving infection to progress to peritonitis and septic shock was a proximate cause of Mrs. Alvarez's death. The amended report states that had her clinical condition been monitored appropriately, she would not have been prematurely discharged, and the apparent cause of her rapidly-deteriorating condition would have been timely discovered before her condition became life-threatening, such that appropriate intervention would have likely prevented her death.

discharge and inappropriate treatment of small bowel perforation, physicians are solely responsible for discharge and treatment decisions." Methodist, however, does not cite any legal authority to support this statement. Furthermore, we are aware, as we noted earlier, that only qualified physicians may render an opinion on causation. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(5)(C); *Abshire*, 563 S.W.3d at 224 n. 8. But a single expert need not address all issues concerning each healthcare provider. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(i); *Abshire*, 563 S.W.3d at 223. It is not unusual to have combined reports in a case such as this, which involves (at least in part) nursing care, because a nurse is qualified to opine as to the standards of care and breach of those standards, but a physician's opinion is needed to opine on whether those breaches were a proximate cause of the injury or injuries on which the suit is based. *See Abshire*, 563 S.W.3d at 223-24. Expert reports from a doctor and a nurse may be considered together to determine whether there has been a good faith effort to comply with the Act's requirements. *See id.*

Accordingly, the trial court did not abuse its discretion in denying Methodist's second motion to dismiss, and we overrule appellant's issue. Because we lack jurisdiction, we do not address the portion of this consolidated interlocutory appeal that concerns Methodist's first motion to dismiss. We affirm the trial court's order denying Methodist's second motion to dismiss.

/Lana Myers/
LANA MYERS
JUSTICE

181073F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

METHODIST HOSPITALS OF DALLAS
D/B/A METHODIST HEALTH SYSTEM
AND D/B/A METHODIST DALLAS
MEDICAL CENTER, Appellant

No. 05-18-01073-CV     V.

JESUS NIETO, RICHARDO FELIPE
NIETO, JESSE NIETO, AND ORLANDO
NIETO, EACH INDIVIDUALLY AND AS
HEIRS OF THE ESTATE OF MARY
JESSIE ALVAREZ, DECEASED,
Appellees

On Appeal from the 193rd Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DC-18-02115.
Opinion delivered by Justice Myers.
Justices Osborne and Nowell participating.

This Court's opinion of August 22, 2019 is **WITHDRAWN** and the judgment of August 22, 2019 is **VACATED**. The following is now the judgment of this Court:

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellees JESUS NIETO, RICHARDO FELIPE NIETO, JESSE NIETO, AND ORLANDO NIETO, EACH INDIVIDUALLY AND AS HEIRS OF THE ESTATE OF MARY JESSIE ALVAREZ, DECEASED recover their costs of this appeal from appellant METHODIST HOSPITALS OF DALLAS D/B/A METHODIST HEALTH SYSTEM AND D/B/A METHODIST DALLAS MEDICAL CENTER.

Judgment entered this 15th day of November, 2019.